No. 76,184

*In re* CHEROKEE COUNTY, KANSAS HEALTH CARE FACILITY
REVENUE BONDS.
(946 P.2d 83)

Opinion filed September 19, 1997.

*James T. McIntyre*, of Law Offices of James T. McIntyre, Chartered, of Wichita, argued the cause and was on the brief for appellant Glenn Mumma.

*Donald G. Reinsch*, Clark, Mize & Linville, Chartered, of Salina, argued the cause and was on the brief for appellee Sunflower Bank.

*Patrick H. Thompson*, of Thompson & Heidrick, of Salina, guardian ad litem, argued the cause for unrepresented bondholders.

The opinion of the court was delivered by

DAVIS, J.: Cherokee County, Kansas, issued revenue bonds for construction of an adult care facility. All bonds were issued on parity secured by the facility. The tenant of the facility defaulted on rent owed, which constituted the sole source of bond repayment. The defendant Glenn Mumma's $50,000 bond matured after default. The trustee appointed by the county sought a declaratory judgment, asking among other things that moneys accumulated in the principal and interest account be paid pro rata on past ·due interest payments to all bondholders before payment on Mumma's principal indebtedness. The trial court agreed with the trustee and certified Mumma's appeal under the provision of K.S.A. 60-254(b). We affirm.

The facts are not in dispute. Pursuant to K.S.A. 12-1740 *et seq.*, the Board of Cherokee County Commissioners (County) issued revenue bonds to fund construction of a nursing home and assisted living facility, as well as for the purpose of paying the cost of issuance and the interest on the bonds during the construction period. The bonds were issued in the following series, years, and principal amounts: Series A, 1991: $1,575,000; Series B, 1991: $175,000; Series A, 1993: $300,000; and Series B, 1993: $150,000.

The Series A and B, 1991 bonds are secured by the project and certain other funds to be deposited and held under a special con-

tractual agreement collectively comprised of the trust indenture dated December 1, 1991, and the first supplemental trust indenture, dated on the same date, by and between the County and the trustee appointed by the County to manage the property on behalf of the bondholders, the Sunflower Bank, formerly First National Bank and Trust of Salina.

The Series A and B, 1993 bonds are secured on a parity basis with the 1991 bonds under a contractual amendment by the original parties to the trust indenture, and the first supplemental trust indenture, which amendment takes the form of a second supplemental trust indenture, dated February 1, 1993. Section 209(a) of the 1991 trust indenture states that "[a]dditional Bonds may be issued under and equally and ratably secured by this Indenture on a parity with the Series A, 1991 Bonds and any other Additional Bonds Outstanding at any time and from time to time." Section 203 of the 1991 first supplemental trust indenture provides:

"Additional Bonds may be issued under and equally and ratably secured under the Indenture on a parity with the Series A, 1991 Bonds and the Series B, 1991 Bonds and any other Additional Bonds Outstanding at any time and from time to time, upon compliance with the conditions and for any of the purposes provided in the Series A, 1991 Bonds."

The 1993 second supplemental trust indenture provides that "[t]he 1993 Bonds are on a parity and co-equal in all respects with the 1991 Bonds." Section 201 of that same document provides in part that "[t]he 1993 Bonds and the interest thereon shall be limited obligations of the Issuer payable on a parity and co-equally with the 1991 Bonds, *solely and only from the Trust Estate created pursuant to the [Trust] Indenture*." (Emphasis added.)

The nursing home and assisted living facility was, and is, operated by the Cherokee County Health Care Corporation (CCHCC), a not-for-profit Kansas corporation which qualifies under § 501(c)(3) of the Internal Revenue Code as a tax-exempt organization. In order to secure payment of the bonds, CCHCC entered into a lease agreement which provided for rental payments in amounts and for a period sufficient to retire the bonds through regular monthly payments. The rent was to be deposited into a principal and interest payment account (P&I account) from which bondholders would

be paid interest and principal as due. CCHCC also signed a guaranty that a separate account, the bond reserve account, would maintain a minimum balance of $150,000 and that CCHCC would deposit funds should the balance drop. The lease and guaranty, along with the facility buildings and property, were pledged by the County to secure full payment to the bondholders.

The bonds were purchased by Chapman Securities, Inc., and resold to bondholders across the country. Mumma is an equitable owner of a Series B, 1991, bond registered of record in the name of DBM Company, c/o Security Bank. Mumma's bond, in the principal amount of $50,000, matured on December 1, 1993.

Prior to December 1, 1993, CCHCC defaulted on the payment of rent. The parties stipulated that as a result of the tenant's default, the trustee was unable to make the scheduled payments due the bondholders as of December 1, 1993, from the P&I account. Additionally, as of December 1, 1993, the bond reserve account contained funds of only $75,908.75, substantially below the $150,000 required minimum balance.

No principal payments have been made on any outstanding bonds. Based on the record before this court, three scheduled principal amounts of Series B, 1991 bonds have matured and remain unpaid: $50,000 as of December 1, 1993; $60,000 as of December 1, 1994; and $65,000 as of December 1, 1995. None of the semiannual interest payments that were due to the bondholders pursuant to the 1991 bonds and the 1993 bonds have been paid. The total amount of funds on deposit in the P&I account is insufficient to pay the matured principal and the past due interest payments.

Remedies on default are provided for in the trust indenture under Article IX, sections 901, 902, 903, and 904 provide as follows:

"Section 901. Acceleration of Maturity in Event of Default.

"(a) If an Event of Default shall have occurred and be continuing, the Trustee may, and upon the written request of the Owners of not less than 51% in aggregate principal amount of Bonds then Outstanding shall, by notice in writing delivered to the Issuer and the Tenant, declare the principal of all Bonds then Outstanding and the interest accrued thereon immediately due and payable, and such principal and interest shall thereupon become and be immediately due and payable.

"(b) If, at any time after such declaration, but before the Bonds shall have matured by their terms, all overdue installments of principal and interest on the

Bonds, together with the reasonable and proper expenses of the Trustee, and all other sums then payable by the Issuer under this Indenture shall either by paid or provision satisfactory to the Trustee shall be made for such payment, then and in every such case the Trustee shall, but only with the approval of the Owners of not less than 51% in aggregate principal amount of the Bonds Outstanding, rescind such declaration and annul such default in its entirety.

"(c) In case of any rescission, then and in every such case the Issuer, the Trustee and the Bondowners shall be restored to their former position and rights hereunder respectively, but no such rescission shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon.

"Section 902. Exercise of Remedies by the Trustee.

"(a) If an Event of Default shall have occurred and be continuing, the Trustee shall pursue and exercise any available remedy at law or in equity by suit, action, mandamus or other proceeding or exercise such one or more of the rights and powers conferred by this Article as the Trustee, being advised by counsel, shall deem most expedient in the interests of the Bondowners to enforce the payment of the principal of, premium, if any, and interest on the Bonds then Outstanding, and to enforce and compel the performance of the duties and obligations of the Issuer as herein set forth.

"(b) All rights of action under this Indenture or under any of the Bonds may be enforced by the Trustee without the possession of any of the Bonds or the production thereof in any trial or other proceedings relating thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its name as Trustee without necessity of joining as plaintiffs or defendants any Owners of the Bonds, and any recovery of judgment shall, be for the equal benefit of all the Owners of the Outstanding Bonds.

"Section 903. Limitation on Exercise of Remedies by Bondowners.

"No Owner of any Bond shall have any right to institute any suit, action or proceeding in equity or at law for the enforcement of this Indenture or for the execution of any trust hereunder or for the appointment of a receiver or any other remedy hereunder, unless (i) a default has occurred of which the Trustee has knowledge, (ii) such default shall have become an Event of Default, (iii) the Owners of 51% in aggregate principal amount of Bonds then Outstanding shall have made written request to the Trustee, shall have offered it reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit or proceeding in its own name, or shall have offered to the Trustee indemnity for all [costs] and expenses in the exercise of such powers and (iv) the Trustee shall thereafter fail or refuse to exercise the powers herein granted or to institute such action, suit or proceeding in its own name; and such knowledge and request are hereby declared in every case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts of this Indenture, and to any action or cause of action for the enforcement of this Indenture, or for the appointment of a receiver or for any other remedy hereunder, it being un-

derstood and intended that no one or more Owners of the Bonds shall have any right in any manner whatsoever to affect, disturb or prejudice this Indenture by its, his or their action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of the Owners of all Bonds then Outstanding. Nothing in this Indenture contained shall, however, affect or impair the right of any Bondowner to payment of the principal of and interest on any Bond at and after the maturity thereof or the obligation of the Issuer to pay the principal of, premium, if any, and interest on each of the Bonds issued hereunder to the respective Owners thereof at the time, place, from the source and in the manner herein and in the Bonds expressed.

"Section 904. Right of Bondowners to Direct Proceedings.

"Anything in this Indenture to the contrary notwithstanding, the Owners of 51% in aggregate principal amount of Bonds then Outstanding shall have the right, at any time, by an instrument or instruments in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Indenture, or for the appointment of a receiver or any other proceedings hereunder; provided that such direction shall not be otherwise than in accordance with the provisions of law and of this Indenture and provided further said Bondowners shall reasonable indemnify Trustee for all costs and expenses in the exercise of said rights and remedies."

In its petition for declaratory judgment, the trustee states that it is entitled to invoke numerous remedies and is contemplating a variety of options with respect to the facility, the additional property, and the lease, which actions may include, but are not limited to: (a) canceling the lease and foreclosing on the facility and personal property with sale proceeds being distributed to bondholders (which may result in significant losses to bondholders); (b) pursuing an "exchange refunding" (essentially a "workout" or "adjustment of payments" to better meet the tenant's performance and thereby distribute any losses pro rata among the bondholders, with the intent of sharing losses and maximizing payments which would minimize the overall loss to bondholders while making the facility itself financially viable); or (c) finding a substitute not-for-profit tenant which could properly manage, market, and operate the facility, and assume the scheduled lease payments. The trustee seeks the court's guidance and instruction with respect to its pursuit of these alternatives, recognizing that some of them may require

bondholders' approval. The above matters, while of critical importance to all parties, are not issues before this court.

The trustee filed a motion for an order approving a pro rata distribution of funds to the bondholders, declaring the tenant's default, and for setting a deadline for tenant to obtain bondholders' approval of its refunding proposal. In that motion, the trustee proposed a pro rata distribution of funds in the amount of $100,000 (the amount accumulated less expenses) to be paid to the bondholders from the funds on deposit in the P&I account representing a pro rata payment of part of the interest in arrears due and owing to the bondholders.

The tenant, CCHCC, has offered a workout proposal consisting of an exchange refunding. Generally, the intent of the tenant's proposed exchange refunding is to adjust the tenant's payments to better meet the tenant's performance and thereby distribute any losses pro rata among the bondholders, with the intent of sharing losses and maximizing payments and minimizing the overall losses to the bondholders while making the facility financially viable. More particularly, the tenant's exchange refunding proposal is that the bond payment periods will be extended by 5 years and that the interest rates on the bonds will be reduced by 50% with the bond principal amounts remaining the same.

The trustee favors exploration of the tenant's proposal, but according to the terms of the bond indenture the exchange refunding proposal requires the bondholders' consent and approval in order to be accepted. The trustee sought an order of the court setting a deadline of November 10, 1995, for the tenant to obtain the bondholders' written consent, approval, and acceptance of the exchange refunding offer as proposed by the tenant. By order of the court the tenant's time to obtain consent of the bondholders was extended to June 1, 1996.

As can readily be seen and as the trial court acknowledges, "[t]his action involves multiple claims, multiple issues and multiple parties." The trial court approved a pro rata distribution of the $100,000 in the P&I fund to all bondholders. Thus, we deal with this very narrow question of whether the trial court was correct in providing for the distribution of the $100,000 accumulated in the

P&I account pro rata to all bondholders for past due interest before distribution of $50,000, the principal amount due and owing to Mumma.

At the hearing on the trustee's motion for pro rata distribution to all bondholders, Mumma lodged the only objection to the proposed distribution. He claimed that he was entitled to his principal payment of $50,000 from his matured bond prior to any pro rata distribution of funds for interest owed to all of the other parity bonds. The district court rejected Mumma's claim, holding that any distribution of funds to the bondholders must be paid first to the accrued interest that is due on all bonds prior to the payment of principal that is due on any bond. In pertinent part, the reasoning and decision of the trial court was as follows:

"8. All of the Bonds are issued on 'parity' (equal priority) and secured under one Trust Indenture, as amended, and all collateral is required to be held in trust for the equal and proportionate benefit, protection and security of all Bondholders without preference, priority or distinction as to lien or otherwise of any of the Bonds over any of the other Bonds.

"9. The Bonds were to be retired from funds received from the Tenant through regular monthly payments pursuant to a Lease. However, an Event of Default occurred with respect to each and all Series of Bonds prior to December 1, 1993 stemming from the Tenant's failure to make the required rental payments under the Lease. None of the parity Bonds matured prior to the Event of Default.

"10. Immediately upon the occurrence of an Event of Default and during its continuance, the Trustee has a first and prior contractual lien that is prior to the payment of principal, redemption premium, or interest on any Bond, as well as a first and prior lien on all moneys on deposit.

"11. Pursuant to the contractual terms of the parity Bonds, accrued interest is due and payable bi-annually. As a result of the Event of Default that occurred prior to December 1, 1993, the subsequent interest payments to all the Bondholders have been missed. As of December 10, 1995, there is accrued interest past due and in arrears owed to all the Bondholders in excess of $447,000.

"12. In addition to the accrued interest that is past due and owed to all Bondholders, as of December 10, 1995, there have also been three (3) missed principal payments in the total amount of $175,000 that are past due. The three (3) scheduled principal amounts that are past due and remain unpaid are $50,000 as of December 1, 1993 (Mumma Bond), $60,000 as of September 1, 1994, and $65,000 as of December 1, 1995. (Additional accrued interest and Bond principal continues to become due periodically.)

"13. Accrued interest is past due and owed to all the Bondholders pursuant to the contractual terms of the Bonds and acceleration of the Bonds is not a prerequisite requirement for accrued interest to become due and payable.

"14. There is no contractual provision providing that the principal of the Mumma Bond is entitled to priority of payment over the payment of accrued interest that is past due and in arrears on all of the parity Bonds following an Event of Default.

"15. The contract between the Bondholders and the Issuer did not intend at the time of its making to give the Mumma Bond or any Bond preference or priority over the other parity bonds.

"16. Kansas follows the 'United States Rule' in situations involving ambiguity over the proper allocation of partial payments on interest bearing debt (*i.e.* Bonds) as between principal and interest. Barring any express agreement or statute to the contrary, the United States Rule requires payment of all accrued interest that is due prior to the payment of any principal that is due.

"17. The Court generally adopts the arguments and authorities submitted by the Trustee in its Motion for Reconsideration. Pursuant to the United States Rule, any distribution of funds to the Bondholders must be paid first to the accrued interest that is due on all Bonds, prior to the payment of principal that is due on any Bond. The Court's Memorandum Decision of November 30, 1995 is reversed and it is specifically found that the Mumma Bond is not entitled to the payment of principal prior to the payment of accrued interest that is due to all the Bondholders.

"18. The Court hereby grants the Trustee's Motion of August 2, 1995 requesting an Order Approving and Permitting a Pro-rata Distribution of Funds to the Bondholders Toward the Partial Payment of Accrued Interest that is Due. Since the proposed distribution of funds in the amount of $100,000 will not pay the accrued interest in full that is due to the Bondholders, it is proper for such a distribution to be made to the Bondholders on a pro-rata basis in the amounts outlined and identified on Exhibit 'A' that is attached to the Trustee's Motion of August 2, 1995. . . .

"19. Any distribution of funds to the Bondholders must be paid first to the accrued interest that is due on all Bonds prior to the payment of principal that is due on any Bond."

The trial court directed entry of judgment pursuant to K.S.A. 60-254(b). The question presented is a question of law. Our scope of review is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

The bonds we deal with are revenue bonds. A revenue bond is one that is payable exclusively from revenues derived from tolls, charges, or rents paid by those who use the facilities constructed with the proceeds from the bonds. Revenue bonds are authorized and issued under state statutes. Revenue bonds are distinguished by the single source of payment, as opposed to general obligation

bonds, which pledge the full faith and credit of the issuer for repayment. Sands & Libonati, Local Government Law § 25.05 (1991).

Revenue bonds also constitute a contract between the obligor and obligee. *City of Chanute v. Polson*, 17 Kan. App. 2d 159, 161, 863 P.2d 6 (1992); 64 Am. Jur. 2d, Public Securities and Obligations § 27. In this case, the contractual rights and duties of all parties are set forth in the bond indentures, trust agreement, and lease agreement. "The payment of bonds is governed by the law in effect at the date of their issuance. Such law forms a part of the bond contract, and the contract may not validly be impaired by subsequent legislation." 15 McQuillin, Municipal Corporations § 43.122 (3d ed. rev. 1995); see *Sebern v. Cobb*, 41 Idaho 386, 389, 238 Pac. 1023 (1925); *Lucas v. First Nat. Bank of Pawnee*, 171 Okla. 606, 607, 43 P.2d 752 (1935). To the extent that the provisions of the bond contract do not conflict with state law, they are subject to enforcement in accordance with the written terms of the agreement. "On appeal, a written instrument or contract may be construed and its legal effect determined by the appellate court regardless of the construction made by the trial court." *Galindo v. City of Coffeyville*, 256 Kan. 455, Syl. ¶ 2, 885 P.2d 1246 (1994).

The resolution of the very narrow issue under the particular undisputed facts of this case requires that we examine state law and the bond contract (indenture) to ascertain whether either or both provide an answer. If we find that neither speaks to the question, then we must look to Kansas common law to resolve the question.

## STATE LAW

Kansas statutes do not speak to payment of revenue bonds. In K.S.A. 12-1747, the legislature defined "revenue bond" as follows:

"Revenue bonds, as the term is used in this act, are defined to be bonds issued by any such city or county to be paid exclusively from the revenue produced by the facilities purchased, acquired, constructed, reconstructed, improved, equipped, furnished, repaired, enlarged or remodeled by the proceeds of such revenue bonds. The revenue bonds shall not be general obligations of the city or county, and shall not contain the recitals set forth in K.S.A. 10-112, or any amend-

ments thereto. The revenue bonds shall, however, contain the following recitals, *viz.*: Such bonds shall recite the authority under which such revenue bonds are issued, and that they are issued in conformity with the provisions, restrictions and limitations thereof, and that such bonds and the interest thereon are to be paid from the money and revenue received from the fees charged and rental received for the use of the property and facilities purchased, acquired, constructed, reconstructed, improved, equipped, furnished, repaired, enlarged or remodeled by the proceeds, in whole or in part, of such revenue bonds when issued and sold."

## Further discussion is found in K.S.A. 12-1743:

"Nothing in this act shall be so construed as to authorize or permit any city or county to make any contract or to incur any obligation of any kind or nature except such as shall be evidenced by the issuance of revenue bonds payable solely out of the rentals received from such facilities.

"Revenue bonds issued under the provisions of this act are declared to be negotiable instruments, shall be executed by the mayor and clerk of the city or the chairperson of the board of county commissioners and the clerk of the county and the corporate seal of the city or county shall be affixed to or imprinted thereon. The principal of and interest on the revenue bonds shall be payable solely and only from the special fund herein authorized for such payments, and the revenue bonds shall not in any respect be a general obligation of such city or county, nor shall they be payable in any manner by taxation. All details pertaining to the issuance of the revenue bonds and the terms and conditions thereof shall be determined by ordinance of the city or resolution of the county."

These provisions, while instructive on the nature of revenue bonds, do not address bond payment or priority. Further, a copy of the county resolution whereby the bonds were issued is not included in the record on appeal.

## CONTRACT INTERPRETATION

Mumma argues that the trust indenture and supplemental documents mandate the payment of his principal before the payment of interest owed all bondholders. He asserts that upon default, the trustee must act according to Article IX of the trust indenture dealing with remedies on default. Section 901 states in relevant part:

"(a) If an Event of Default shall have occurred and be continuing, the Trustee may, and upon the written request of the Owners of not less than 51% in aggregate principal amount of Bonds then Outstanding shall, by notice in writing delivered to the Issuer and the Tenant, declare the principal of all Bonds then Outstanding and the interest accrued thereon immediately due and payable, and such principal and interest shall thereupon become and be immediately due and payable."

Mumma notes that upon CCHCC's default, the trustee did not exercise its option to accelerate the debt under this provision and distribute the funds pro rata. Therefore, he asserts that section 603 directs a precise method of distribution of funds. This section states in part:

"(a) . . . [M]oneys in the Principal and Interest Payment Account shall be expended solely for the payment of the principal of, premium, if any, and interest on the Bonds as the same mature and become due or upon the redemption thereof prior to maturity.

"(b) The Issuer hereby authorizes and directs the Trustee to withdraw sufficient funds from the Principal and Interest Payment Account to pay *the principal of, premium, if any, and interest on the Bonds as the same become due and payable* and to make said funds so withdrawn available to the Paying Agents for the purpose of paying said principal, premium, if any, and interest." (Emphasis added.)

Mumma contends that these provisions delineate the *order of payment*. Thus, the principal of his matured bond must be paid prior to any premiums and accrued interest.

Mumma also relies upon section 606 of the trust indenture:

"In the event funds credited to and deposited in the Principal and Interest Payment Account are insufficient to provide for payment when due of *the principal of and interest on the Bonds*, the Trustee shall and is hereby directed to withdraw from the Bond Reserve Account and transfer to the Principal and Interest Payment Account such sum as shall be necessary to provide for *payment of such principal and interest*, which shall be applied by Trustee in accordance with the provisions of Section 603 hereof." (Emphasis added.)

The trustee challenges Mumma's interpretation of the sections cited by Mumma as directing the order of distribution. It asserts that the language of those sections only explains the general use of the funds in the P&I account rather than requiring that the principal of a mature bond to be paid prior to premiums or interest. This argument pinpoints the precise issue before us, *i.e.*, whether the language "moneys in the Principal and Interest Payment Account shall be expended solely for the payment of the principal of, premium, if any, and interest on the Bonds as the same mature and become due or upon the redemption thereof prior to maturity" directs the trustee to pay upon CCHCC's default the principal first, followed by any premiums, and finally any interest due. We deter-

mine that this language does not support the interpretation advanced by Mumma.

In construing the language of the trust indenture, we note the following rules of interpretation: "The cardinal rule of contract construction requires courts to determine the parties' intent from the four corners of the instrument by construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Metropolitan Life Ins. Co. v. Strnad,* 255 Kan. 657, 671, 876 P.2d 1362 (1994). " 'As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction.' " *Gore v. Beren,* 254 Kan. 418, 427, 867 P.2d 330 (1994) (quoting *Simon v. National Farmers Organization, Inc.,* 250 Kan. 676, 680, 829 P.2d 884 [1992]).

The language cited by Mumma gives no indication that the parties intended to mandate a specific order of payment as between principal, premiums, and interest. Rather, the language is simply a list which is silent on the issue of priority of payment. We find no support for Mumma's interpretation. The bond contract (indenture) does not by its terms provide for an order or priority of payment from the fund upon default. The trial court was correct in its conclusion that the trust indenture does not mandate payment of Mumma's principal prior to the interest accrued by all bondholders.

In very broad terms the bond indentures clearly indicate an intent to treat all bondholders alike. As the trial court concludes, all bonds are issues in parity and coequal with all other bondholders. Moreover, the intent expressed generally throughout the indentures is that all bondholders are to be treated alike. For example, in addressing limitations on the exercise of remedies by bondholders section 903 provides agreement by the owners of 52% in aggregate principal amount of bonds,

"it being understood and intended that no one or more Owners of the Bonds shall have any right in any manner whatsoever to affect, disturb or prejudice this Indenture by its, his or their action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be

instituted, had and maintained in the manner herein provided and for the equal benefit of the Owners of all Bonds then Outstanding."

The distribution of the $100,000 accumulated in the P&I account to all bondholders for past interest due and owing rather than the distribution of $50,000 to Mumma for his principal amount due and owning on his bond more closely reflects the general intent of the indentures.

We, however, must emphasize that we are not called upon to determine distribution under circumstances where the trustee has accelerated payment, whereby all obligations under the bond issues would become due and owing. Nor are we called upon to determine priority among bondholders with regard to principal amounts due. As the trial court noted:

"20. The issue of whether the payment of principal on any Bond has priority over the payment of principal on any other Bond is not before the Court at this time. This issue shall be reserved for later determination in the event that all accrued interest due on the Bonds is paid in full or in the event the maturity of the Bonds are accelerated."

In affirming the trial court, not only do we rely on the general intent expressed in the indenture, but by way of analogy from the private sector, we note that the trial court relied on what has been referred to as the "United States Rule."

## COMMON LAW

The trial court based its decision upon a rule adopted by this court in regard to partial payments on a private interest-bearing debt. This rule, referred to as the "United States Rule," provides that "in applying partial payments to an interest-bearing debt which is due, in the absence of an agreement or statute to the contrary, the payment should first be applied to the interest due." *Shutts, Executor v. Phillips Petroleum Co.*, 222 Kan. 527, Syl. ¶ 24, 567 P.2d 1292 (1977), *cert. denied* 434 U.S. 1068 (1978).

We first applied the United States Rule in *Christie v. Scott*, 77 Kan. 257, 94 Pac. 214 (1908), and then cited the rule favorably in *Jones v. Nossaman*, 114 Kan. 886, 221 Pac. 271 (1923). See *Wortman v. Sun Oil Co.*, 236 Kan. 266, 690 P.2d 385 (1984), *vacated and remanded on other grounds* 474 U.S. 806, 106 S. Ct. 40, 88

L. Ed. 2d 33 (1985), and *Gray v. Amoco Production Company*, 1 Kan. App. 2d 338, 564 P.2d 579 (1977), *aff'd in part, rev'd in part*, 223 Kan. 441, 573 P.2d 1080 (1978). Neither state law nor the bond contract addresses the question of priorities upon default except to say that all bonds are of equal dignity and are on a parity and coequal in all respects. The trial court determined that the narrow issue presented for resolution involved the question of priority between a matured bondholder claiming full payment of his principal and all bondholders' claim to a pro rata payment of the interest due upon defaulted bonds.

We acknowledge that the case we deal with is one involving public debt. Unlike a private debt, public revenue bonds are payable exclusively from revenues derived from rents paid by those who use the facilities constructed with the proceeds from the bonds. Moreover, the rights and obligations of the parties involved in the issuance of revenue bonds are governed by statute and written contract (indenture). Generally, the United States Rule would have limited application in a case of a public bond issue. However, where Kansas statutes are silent and the bond indentures and Kansas case law provide no guidance, the United States Rule by analogy is helpful in resolving the question.

An early Kansas case cited by none of the parties would seem at first blush to provide authority for Mumma's position. *Ward v. Piper*, 69 Kan. 773, 77 Pac. 699 (1904), involved an action in mandamus to compel Isabel Township in Scott County to pay four judgments obtained for past due interest on bonds issued by the township in default. At the time of the suit there was in the township treasury the sum of $357.79, levied and collected for the purpose of paying interest on bonds. In addition, the township also had the sum of $1,003 levied and collected to meet the general current expenses of the township. The plaintiff sought payment of his four judgments for past due interest in the amount of $1,166.29 upon the defaulted bonds.

In the absence of a showing to the contrary, the court assumed that the discretion vested in the township in accumulating funds for operating expenses of the township had been honestly exercised, that taxes levied for one purpose cannot be diverted and

applied to another, and that the township must be maintained and its current expenses met even though creditors of the township must wait for payment of their bonds and judgments. 69 Kan. at 775.

The township defendant argued that there were other creditors holding like claims for past due interest on the defaulted bonds and that the plaintiff should not be given a preference over them. In rejecting this argument, the court said:

"The contention that there are other creditors holding like claims, and that plaintiff should not be given a preference over them, is not good. They are not here demanding payment, or asking that the fund which plaintiff is seeking to obtain be distributed equally with them. The defendants are not competent to speak for them, and it will be time enough to consider the rights of other creditors when they intervene or invoke the action of the court. Upon an application for mandamus to compel the payment of a debt out of a particular fund, and where the municipality made a similar objection, the supreme court of California remarked:

'Nor is the fact, if it exists, that there are other creditors interested in the fund provided for their payment, who have not demanded payment, any answer to the application of the petitioner. Non-action by others having equal rights with him, in a matter on which his right is founded, cannot prejudice him in the assertion of his right nor excuse non-performance of a duty in connection with it specially enjoined by law.' " *Ward*, 69 Kan. 776-77 (citing *Meyer v. Porter*, 65 Cal. 67, 70-71, 2 Pac. 884 [1884]).

*Ward* established a "first in time—first in right" rule which remains the law in this state. As noted by McQuillin, according to the prevailing view:

"If . . . there is a means through which all the bondholders may be paid in full, as where the bond fund may be replenished by the exercise of an unexhausted power of taxation, a bondholder who exercises a higher degree of diligence than others is entitled to have payment in full for the bonds, even though the fund, at the time, is insufficient to pay all of the bonds which have matured. In such a case, the rule of first come, first served, is applied." 15 McQuillin, Municipal Corporations § 43.125.

*Ward*, however, provides no support for Mumma because *Ward* involved *general obligation bonds* of a township. Unlike the revenue bonds we deal with in this decision, all bondholders in *Ward* were secure because the bond fund could be replenished by the exercise of an unexhausted power of taxation. "The township or-

ganization must be maintained and its current expenses met, although creditors of the township *must wait for payment* of their bonds and judgments." (Emphasis added.) 69 Kan. at 775. Moreover, there was no mention of insolvency or the inability of the township to meet all of its obligations under the defaulted bond issue. In such a case, the first in time—first in right rule makes good sense. Equity rewards the vigilant.

Upon the particular undisputed facts involved, we affirm the trial court on the very narrow issue presented in accordance with the provisions of K.S.A. 60-254(b) that interest due and owing to all bondholders be distributed from moneys in the principal and interest fund before payment of principal indebtedness due on Mumma's bond.

Affirmed.

SIX, J., concurs in the result.

LOCKETT, J., dissenting: I respectfully dissent. The majority notes that revenue bonds constitute a contract between the obligor and the bondholder. The majority points out that the rights and obligations of the parties are governed by the written contract and the law in effect on the date that the bonds were issued. According to the contract, the plaintiff, whose bond has matured, has the right to receive principal and interest on the date of maturity.

In approving the trustee's unauthorized attempt to keep the defaulting facility running, the majority acknowledges that it is not relying on the intent expressed in the bond documents, but rather on the particular undisputed facts involved. After disregarding the contract, the majority erroneously places bondholders with matured bonds in the same position as those whose bonds have not matured. In affirming the "narrow issue" it created, the majority concludes that K.S.A. 60-254(b) provides that interest due and owing to all bondholders be distributed from moneys in the principal and interest account fund before payment of principal and indebtedness on Mumma's bond.

K.S.A. 60-254(b) states:

*"Judgment upon multiple claims.* When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim or third-party claim or, when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."

To reach a result, the majority has narrowed the issue to the point that neither the law nor the contract applies. I understand the majority's decision, but cannot determine how it reached its result. Therefore, I must dissent.