**TIME WARNER ENTERTAINMENT COMPANY, L.P. and Liberty Cable of Missouri, Inc., Plaintiffs,**

v.

**ATRIUMS PARTNERS, L.P., Defendant,**

**Everest Midwest Licensee, LLC, d/b/a Everest Connections, Intervenor.**

**Civil Action No. 02–2343–CM.**

United States District Court, D. Kansas.

Nov. 26, 2002.

Bernard J. Rhodes, Lathrop & Gage L.C., Kansas City, MO, for Plaintiffs.

Lee M. Smithyman, James P. Zakoura, David J. Roberts, Smithyman & Zakoura, Chtd., Overland Park, KS, for Defendants.

Rachel L. Reiber, Kansas City, MO, for Intervenor.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

On July 22, 2002, plaintiffs filed a Verified Complaint for Declaratory and Injunctive Relief and a Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 2). On September 24, 2002, Everest Midwest Licensee, L.L.C. (Everest) filed a Motion to Intervene (Doc. 19). On October 2, 2002, plaintiffs filed a First Amended Verified Compliant for Declaratory and Injunctive Relief (Doc. 23). That same day, defendant Atrium Partners, L.P. (Atriums Partners) filed an Answer and Counterclaim of Atrium Partners, L.P. to First Amended Verified Complaint for Declaratory and Injunctive Relief (Doc. 25).

On October 3, 2002, the court held a hearing on the motion for temporary restraining order. At that hearing, the parties presented evidence and agreed to consolidate the hearing with a trial on the merits. The court hereby disposes of this case as follows.

• **Background**

• **Parties**

Plaintiffs currently do business in the greater Kansas City area under the name

Time Warner Cable (Time Warner).[1] Time Warner is a franchised cable television operator that operates a cable television system. Atrium Partners owns "The Atriums," a 206–unit, six-story retirement complex in Overland Park, Kansas. Everest is a facilities-based broadband provider of telecommunications, cable, and high speed internet services via cable modem.

### • The Agreement

In 1987, Joseph Tutera, as agent for Atrium Partners, contacted TeleCable of Overland Park, Inc.[2] (TeleCable) about the possible provision of cable television services at the Atriums. James Pirner, general manager of TeleCable at the time, forwarded to Mr. Tutera the "standard license agreement" TeleCable used to provide cable television services to apartment buildings. Mr. Tutera returned the executed license agreement (Agreement) to Mr. Pirner without change.

The Agreement states that "TeleCable desires to install, operate and maintain its cable, junction boxes, and other facilities incidental or related to the provision of its services to tenants in the Project ("the facilities") in order to serve those tenants of Owner who shall from time to time pay Telecable for its services." The Agreement granted to TeleCable "the right, license and permission to install, operate and maintain such of the facilities as TeleCable deems necessary or desirable in or on Owner's property and in the Project in order to provide CATV and Pay TV services to tenants in the Project." Other relevant provisions state that "the facilities installed by TeleCable in the Project or elsewhere on Owner's property shall be and remain the sole and exclusive property of TeleCable and shall be treated as personal property of TeleCable for all purposes," and that "[t]he license herein granted shall remain in effect and may not be terminated by Owner unless and until the Project is destroyed or demolished." Finally, the Agreement states, "Owner reserves the right to grant other licenses or easements which do not interfere with TeleCable's rights under this license."[3]

### • The Facilities

After the Agreement was executed, Time Warner installed cable wiring at the Atriums. The cable wiring inside the Atriums can be broken down into three parts. The first part, called the "riser," consists of a single large cable that comes from outside the building, and then "rises" up through the floor of each of the six stories. Within the utility closet on each floor is a junction box, to which the riser is connected. The junction box divides the signal from the riser into separate connectors for each individual apartment.

The second part of the wiring is called the "home run wiring." The home run wiring begins at the junction box, where the individual wiring for each apartment begins. Specifically, the home run wiring is the dedicated wires that go from the junction box to a point at (or about) twelve inches outside where the cable enters the individual apartments. The home run wiring travels through ceiling soffits above the hallways encircling each floor. The twelve-inch point outside the individual apartments is called the "demarcation point."

---

1. For purposes of this opinion, plaintiffs will be referred to collectively as "Time Warner."

2. In 1998, Time Warner acquired substantially all of the assets of TCI of Overland Park, Inc., a Kansas corporation formerly known as TeleCable of Overland Park, Inc., including

Telecable's rights under the agreement at issue in this case.

3. To avoid possible confusion, the court will, from this point forward, refer to "TeleCable" as "Time Warner."

The third part of the cable wiring, called "home wiring," begins at the demarcation point, *i.e.*, in the ceiling soffit twelve inches outside the individual apartments, and continues through the wall of the apartment, ending at the cable outlet mounted on the inside wall(s) of the apartment. The demarcation point may or may not be reflected by a mechanical connection. In other words, the home run wires may go directly from the junction box to the individual cable outlet wall plates without any junction or connection.

### • The Dispute

On June 26, 2002, Atrium Partners made a written demand on Time Warner, purporting to invoke its rights under the Federal Communications Commission (FCC) regulation 47 C.F.R. § 76.804(b) (FCC Home Run Wiring Regulations), which provides:

> Where an MVPD [4] owns the home run wiring in an MDU [5] and does not (or will not at the conclusion of the notice period) have a legally enforceable right to maintain any particular home run wire dedicated to a particular unit on the premises against the MDU owner's [6] wishes, the MDU owner may permit multiple MVPDs to compete for the right to use the individual home run wires dedicated to each unit in the MDU. The MDU owner must provide at least 60 days' written notice to the incumbent MVPD of the MDU owner's intention to invoke this procedure. The incumbent MVPD will then have 30 days to provide a single written election to the MDU owner as to whether, for each and every one of its home run wires

dedicated to a subscriber who chooses an alternative provider's service, the MVPD will: remove the wire and restore the MDU building consistent with state law; abandon the wiring without disabling it; or sell the wiring to the MDU owner.

47 C.F.R. § 76.804(b) (footnotes added). In the letter, Atrium Partners demanded that Time Warner Cable elect to either abandon, remove, or sell the home run wiring in the Atriums.

The precise issue to be determined by this court is whether the provisions of § 76.804(b) apply to the home run wiring installed by Time Warner in the Atriums. Time Warner argues that § 76.804(b) does not apply because it has a legally enforceable right to continue to provide cable service to the tenants of the Atriums. Atriums Partners and Everest, on the other hand, contend that § 76.804(b) does apply and that, as a result, Time Warner must either abandon, remove, or sell to Atrium Partners the home run wiring it installed. In essence, Atrium Partners seek to bring competition for telecommunications and cable services to its individual residents without forcing the new entrant (Everest) to install a complete new set of home run wiring. For clarification, the court notes that the only wiring at issue in this case is the home run wiring-that wiring which runs from the junction box to the demarcation point.

### • FCC Regulations

The FCC promulgated the Home Run Wiring Regulations to establish procedures regarding the disposition of MDU

---

**4.** An "MVPD" is defined as a multichannel video programming distributer. 47 C.F.R. § 76.800(c). Both Time Warner and Everest are MVPDs.

**5.** An "MDU" is defined as a multiple dwelling unit building. 47 C.F.R. § 76.800(a). The Atriums is an MDU.

**6.** An "MDU owner" is defined as the entity that owns or controls the common areas of a multiple dwelling unit building. 47 C.F.R. § 76.800(b). Atrium Partners is an MDU owner.

home run wiring upon MDU tenants' termination of service. *See* Report and Order and Second Further Notice of Proposed Rulemaking in the Matter of Telecommunications Services Inside Wiring, 1997 WL 644031, 13 F.C.C.R. 3659, 13 FCC Rcd. 3659, CS Docket No. 95–184, MM Docket No. 92–260, FCC No. 97–376 (October 17, 1997) (FCC Report). The FCC noted that MDU owners often object to the installation of multiple home run wires in the hallways of their properties (due to aesthetics, space limitations, disruptions, inconvenience, potential property damage) and that, as a result, MDU residents are often denied the ability to choose among competing service providers. *Id.* ¶¶ 35, 36.

The FCC determined that establishing such procedures "is a necessary, 'appropriate, and reasonable' method to fulfill Section 623's mandate of reasonable cable rates." *Id.* ¶ 88. The FCC further commented that the inability of MDU owners to use existing home run wiring "deters consideration of alternative providers" and that the home run wiring rules provide "a reasonable means of increasing choice and promoting competition." *Id.* ¶ 91. Accordingly, the FCC Home Run Wiring Regulations were promulgated, providing in essence that, when an individual subscriber voluntarily terminates cable service, the MDU owner has the right to purchase the cable home wiring for use by competing service providers, subject only to an enforceable legal right of the incumbent provider to maintain its home run wiring.

## ● Discussion

### ● Recent Caselaw

After the October 3rd hearing in this case, the Southern District of New York rendered an opinion in a case captioned *CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condominium, et al.,* 2002 WL 31798940, No. 01–8134 (S.D.N.Y. Oct. 21,

2002). Time Warner provided the court with a copy of the opinion, and Atrium Partners submitted a brief response to the opinion. Even though the opinion in *CSC Holdings* is not binding on this court, the court deems it appropriate to address the conclusions set forth in *CSC Holdings.*

The posture of *CSC Holdings* is similar to the case at hand. In *CSC Holdings,* the owner of a 60–unit condominium complex (an MDU owner) had entered into an agreement with CSC Holdings (CSC) (the incumbent MVPD), granting to CSC the "the non-exclusive right to provide telecommunications services to the Premises by placing, maintaining, affixing, and attaching [cable equipment]." The MDU later sought to invoke 47 C.F.R. § 76.804(b) to allow Digitech (an MVPD) to use CSC's home run wiring in order for Digitech to provide video programming to the MDU residents. The court concluded that, pursuant to the agreement between the MDU and CSC, CSC was still entitled to operate in the building, at least as to those tenants still using CSC's cable services. Based on that conclusion, the court ruled that the MDU had no right to invoke the FCC Home Run Wiring Regulations because "[t]hose rules apply only when a cable service provider will no longer be permitted to service any customers in a building." With all due respect, the court disagrees with this ruling.

The *CSC Holdings* court explained that there are two different types of home run wiring rules: rules that govern cabling on a building-wide basis ("Building–by–Building Disposition") and separate rules that govern disposition of home run wires on an individual subscriber basis ("Unit–by–Unit Disposition"). Under the Building–by–Building rules, should an MDU wish to use the existing home run wiring to provide *all* the building residents with service from another provider, it must give ninety days'

notice. In that case, 47 C.F.R. § 76.804(a) governs. Under the Unit–by–Unit rules, an MDU may permit a variety of service providers to compete for the right to serve individual units by giving sixty days' notice. In that case, 47 C.F.R. § 76.804(b) governs. The *CSC Holdings* court went on to state:

> Before EITHER the Building by Building or Unit by Unit Home Run Wiring rules can be invoked, the incumbent service provider must have lost, or be about to lose, its right to remain on the premises against the wishes of the building's owner (or the condominium association). *If the incumbent retains the right to service so much as one customer in the building, these rules simply do not apply.*

(emphasis added). For support, the *CSC Holdings* court looked to the FCC Report, stating that paragraph 69 makes this conclusion "crystal clear." Paragraph 69 states:

> As noted above, the procedural mechanisms we are adopting will apply only where the incumbent provider no longer has an enforceable legal right to maintain its home run wiring on the premises against the will of the MDU owner. These procedures will not apply where the incumbent provider has a contractual, statutory or common law right to maintain its home run wiring on the property.... In the building-by-building context, the procedures will not apply where the incumbent provider has a legally enforceable right to maintain its home run wiring on the premises, even against the MDU owner's wishes, and to prevent a third party from using the wiring. In the unit-by-unit context, the procedures will not apply where the incumbent provider has a legally enforceable right to keep a particular home run wire dedicated to a particular unit (not including the wiring on the subscriber's side of the demarcation point) on the

premises, even against the property owner's wishes.

FCC Report ¶ 69. This court does not interpret paragraph 69 as stating that the FCC Home Run Wiring Regulations apply in the unit-by-unit context *only* where a cable service provider is no longer permitted to service *any* customer in a building. To the contrary, paragraph 69 distinguishes between the building-by-building context and the unit-by-unit context. This court agrees with the *CSC Holdings* court to the extent that paragraph 69 states that, in the building-by-building context, the rules do not apply where an incumbent provider has a right to maintain its home run wiring on the premises *at all,* even to service one resident. This reading is consistent with the building-by-building rules, which allow an MDU owner to use the existing home run wiring to provide service to "the entire building." 47 C.F.R. § 76.804(a). In that case, if the incumbent service provider has a legally enforceable right to provide service to even one customer, § 76.804(a) cannot apply.

 However, this court reads paragraph 69 as saying that, in the unit-by-unit context, where an incumbent provider has a legally enforceable right to maintain its home run wiring with respect to a particular unit, then an MDU owner cannot use the existing home run wiring dedicated *to that unit.* To read otherwise would render the distinction between § 76.804(a) (building-by-building rule) and § 76.804(b) (unit-by-unit rule) essentially meaningless.

Moreover, other portions of the FCC Report support this conclusion. For example, paragraph 49 discusses the method by which an incumbent provider elects to remove, abandon, or sell its home run wiring.

We adopt the following procedures for unit-by-unit disposition of home run wiring.... The incumbent service provider

[has] 30 days to provide the MDU owner with a written election as to whether, for all of the incumbent's home run wires dedicated to individual subscribers *who may later* choose the alternative service provider's service, it will: [remove, abandon, or sell the wiring].

FCC Report ¶ 49. Thus, the regulations clearly contemplate that an incumbent service provider may still have individual residents subscribing to its service (and may therefore, under the terms of the provider and MDU owner's agreement, have a legally enforceable right to continue to provide such service) at the time an MDU owner invokes § 76.804(b). Additionally, in paragraph 79, the FCC made clear that, in the unit-by-unit context, the home run wire rules are considered on a subscriber-by-subscriber basis:

> Accordingly, our procedures will apply in mandatory access states[7] to the extent state law does not permit the incumbent to maintain its home run wiring (in the case of a building-by-building disposition) *or a particular home run wire to a particular subscriber (in the case of a unit-by-unit disposition)* against the will of the MDU owner.

FCC Report ¶ 79 (emphasis added) (footnote added).

Finally, this court looks to the rules themselves. The court notes that § 76.804(a) refers to an MVPD who does not have a legally enforceable right "to remain on the premises," whereas § 76.804(b) refers to an MVPD who does not have a legally enforceable right "to maintain any particular home run wire dedicated to a particular unit." Moreover, § 76.804(b) allows an MDU owner "to permit multiple MVPD to compete for the right to use the *individual home run wires dedicated to each unit.*" (emphasis

added). Based on the language set forth in the rules themselves, the court concludes that the FCC intended § 76.804(b) to be applicable even where an incumbent cable service provider retains the right to service individual customers on the premises.

Surely the FCC did not contemplate the requirement that every single individual customer must discontinue service with the incumbent cable service provider before an MDU owner can invoke § 76.804(b) and use that incumbent's home run wiring. Such a requirement would create an unnecessary obstacle to allowing individual MDU residents the option of choosing between alternative cable service providers, thereby frustrating the FCC's stated purpose of promoting competition. This court therefore concludes that § 76.804(b) may be invoked by an MDU owner notwithstanding that an incumbent MVPD retains the right to service some of the MDU residents.

In the case at hand, Time Warner still provides cable service to residents at the Atriums. The court has determined that this fact, by itself, does not preclude Atrium Partners from attempting to invoke § 76.804(b). The court therefore turns to the issue of whether § 76.804(b) in fact applies in this case, which would allow Atrium Partners to use the home run wiring not currently used by Time Warner.

● **Contract Law**

Atrium Partners is entitled to invoke the procedures provided in 47 C.F.R. § 76.804(b) only if Time Warner does not "have a legally enforceable right to maintain any particular home run wire dedicated to a particular unit of the premises." This court must therefore determine

---

**7.** Kansas is considered a mandatory access state pursuant to Kan. Stat. Ann. § 58– 2553(a)(5).

whether Time Warner has a legally enforceable right to maintain any particular home run wire dedicated to those Atrium units whose residents do not desire Time Warner cable services. To make this determination, the court must construe and interpret the 1987 Agreement.

Time Warner's license was originally granted pursuant to the Agreement. The interpretation of the Agreement is governed by Kansas contract law.[8] Kansas, like most states, adheres to "the cardinal rule of contract construction" which "requires courts to determine the parties' intent from the four corners of the instrument by construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision." *Berry v. Farmland Indus., Inc.,* 114 F.Supp.2d 1150, 1157 (D.Kan.2000) (quoting *In re Cherokee County, Kan. Health Care Facility Revenue Bonds,* 262 Kan. 941, 953, 946 P.2d 83, 91 (1997)).

Atrium Partners argues that the court must construe the Agreement strictly against Time Warner for three reasons. Atrium Partners first asserts that the Agreement was drafted by Time Warner and must, therefore, be construed against Time Warner. Secondly, Atrium Partners claims that the Agreement is a contract of adhesion and, as such, should be interpreted narrowly against Time Warner. Finally, Atrium Partners argues that the contract affects the public interest and should, accordingly, be construed liberally in favor of the public. The court addresses these three arguments in turn.

● **Time Warner Drafted the Agreement**

■ A basic principle in the construction of contracts is that an ambiguity in the language of the contract will be strictly construed against the party who drafted the provision. *Heaton v. Crum & Forster*

*Ins. Co.,* 920 F.Supp. 160, 163 (D.Kan. 1996). "There is an elementary rule of law that where one party to a contract is privileged to set down in writing the terms to which another party is to give assent, and a controversy arises as to their meaning, the contract should be construed strictly against the writer and liberally toward the other party." *Dillard Dep't Stores, Inc. v. Kan. Dept. of Human Res.,* 28 Kan.App.2d 229, 235, 13 P.3d 358, 363 (2000) (citations omitted). The purpose for this rule "is to protect the party who did not choose the language from an unintended or unfair result." *Id.* at 236–37, 13 P.3d at 364 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)).

In the case at hand, there is no dispute that Time Warner drafted the Agreement by providing to Atrium Partners a pre-printed form. Thus, to the extent that the terms of the Agreement are open to different, yet reasonable interpretations, those terms will be construed against Time Warner.

● **Adhesion Contract**

■ An adhesion contract is a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." *Anderson v. Union Pac. R.R. Co.,* 14 Kan. App.2d 342, 346, 790 P.2d 438, 441 (1990) (quoting Black's Law Dictionary 38 (5th ed.1979)). One hallmark of the adhesion contract is that the purchaser cannot reasonably obtain the necessary goods or services on alternative terms from any other source. *Monsanto Co. v. McFarling,* 302 F.3d 1291, 1301 (Fed.Cir.2002).

8. The parties do not dispute that Kansas law governs the interpretation of the Agreement.

■ Atrium Partners argues that the Agreement is a contract of adhesion and, accordingly, should be construed against Time Warner. For support, Atrium Partners first points out that, at the time the Agreement was executed, Time Warner was the only cable company franchised by the city of Overland Park. Thus, Time Warner in effect held a monopoly. In response, Time Warner asserts that there were alternative services available. For instance, other area apartment owners at the time chose to install satellite antenna television systems (SMATV), and others installed both cable television and SMATV. While Time Warner claims that SMATV provided much the same programming as cable television, Atrium Partners points to testimony in the record supporting the position that SMATV had far fewer channels than hard wire cable television. Moreover, since SMATV was merely a large antenna with cables running to individual outlets, the reception was not as dependable and often was affected by weather and atmospheric changes. The court concludes that, in 1987, Atrium Partners had no real choice in providing quality television programming to its residents. SMATV clearly was inferior and offered no real alternative to cable television. As the only franchised cable service provider in the city, Time Warner held a monopoly and, therefore, enjoyed a superior bargaining position.[9]

Atrium Partners also asserts that the terms of the Agreement were presented to Mr. Tutera in the form of a fill-in-the-blank, preprinted contract. Atrium Partners contends that, as a result, Mr. Tutera, who was just two years out of college, did not believe he could negotiate the terms of the contract. Time Warner responds by arguing that it was willing to negotiate, and in fact did negotiate with other MDU owners, the terms of the Agreement. The court has reviewed the several license agreements provided by Time Warner showing that other MDU owners did in fact negotiate the terms of their license agreements. While the court did locate some minor changes in those agreements, the changes were not significant, nor were there any modifications to the respective terms at issue in this case. The court is unconvinced that the terms of the Agreement upon which Time Warner now relies were negotiable at the time the Agreement was executed.

The superior bargaining power of Time Warner, coupled with the nature of the pre-printed, standardized form of the contract, leads the court to conclude that the contract was adhesive in nature. On this additional basis, the court will follow a strict construction of the Agreement against Time Warner.

### ● Public Interest

The court is mindful that "contracts affecting the public's interest generally are liberally interpreted to favor the public." *Simon v. Farmland Indus., Inc.,* 505 F.Supp. 59, 61 (D.Kan.1980) (citing *United States v. Kan. Gas and Elec. Co.,* 215 F.Supp. 532, 542 (D.Kan.1963)). Here, the Agreement clearly affects the public interest.

The public, as consumers of cable television services, has an interest in paying reasonable rates for those services. Thus, the public interest is served when consumers are given choices about whom they can select to provide their cable service.

9. The FCC Report recognized the typical circumstances under which these license agreements were entered. The FCC, in commenting that the incumbent cable providers often "invoke written agreements providing for continued service," stated that these "agreements are frequently unclear, often having been entered into in an era of an accepted monopoly." FCC Report ¶ 38.

Moreover, the public has an interest in avoiding the potential disruption of having their home wiring removed upon the voluntary termination of the incumbent provider's service and then, subsequently, having the new provider install its home run wiring.[10] The FCC Report makes clear that these are stated purposes of the Telecommunications Act of 1996, the act under which the FCC Home Run Wiring Rules were promulgated. *See e.g.*, FCC Report ¶ 36 ("[The Telecommunication Acts] was intended to promote consumer choice and competition by permitting subscribers to avoid the disruption of having their home wiring removed upon voluntary termination and to subsequently utilize that wiring for an alternative service"). Accordingly, because the Agreement at issue affects the public interest, the court will, where appropriate, liberally construe the Agreement to favor the public.

### • Interpretation of the Agreement

The court now turns to the terms of the Agreement to determine whether Time Warner has a legally enforceable right to maintain its home run wiring in the circumstances where an Atriums resident discontinues Time Warner's cable service. If Time Warner has such a right, the provisions of 47 C.F.R. § 76.804(b) do not apply. If, on the other hand, the court determines that the Agreement does not grant Time Warner such a right, § 76.804(b) applies, and Time Warner must make an election to either abandon, remove, or sell its home run wiring to Atrium Partners.

Pursuant to the Agreement, Atrium Partners granted Time Warner "the right,

license and permission to install, operate and maintain such of the facilities as [Time Warner] deems necessary or desirable in or on Owner's property and in the Project *in order to provide CATV and Pay TV services to tenants in the Project.*" (emphasis added). Atrium Partners argues that this provision grants Time Warner a license to maintain its facilities[11] only to the extent that Time Warner is, in fact, providing cable services to a particular tenant. In other words, Atrium Partners contends that, once a tenant discontinues his or her cable service, Time Warner's license is extinguished.

In response, Time Warner asserts this provision grants Time Warner a license to maintain its facilities even in the event that a tenant discontinues service. For support, Time Warner points to the provision in the contract which states, "[Time Warner] desires to install, operate and maintain its cable, junction boxes, and other facilities incidental or related to the provision of its services to tenants in the Project ("the facilities") in order to serve those tenants of Owner *who shall from time to time* pay [Time Warner] for its services." (emphasis added). Time Warner urges the court to view this language as evidence that the parties contemplated Time Warner would have a license to store its cable wiring in the ceiling soffits until particular tenants, "from time to time," ordered service. Atrium Partners offers a different interpretation of this clause. Atrium Partners points out that the phrase, "from time to time," modifies the word "pay," not "to serve." Therefore,

---

**10.** At the October 3rd hearing, the parties spent a great deal of time presenting evidence about the extent of the disruption upon the new provider's installation of home run wiring. The court finds it unnecessary to make a specific finding regarding how much disruption actually would occur since the extent of any such disruption is irrelevant to the court's

interpretation of the terms of the Agreement. However, the court notes that, in all cases, there would be some amount of disruption.

**11.** The cables, which include the home run wiring installed by Time Warner within the Atriums, are considered "facilities."

Atrium Partners argues, the provision does not state that Time Warner *shall serve* tenants from time to time, but rather states that tenants *will pay* for service from time to time, meaning that the parties contemplated tenants would pay Time Warner on a periodic basis, *i.e.,* monthly.

■ The court recognizes its duty to determine and give effect to the intent of the parties. The intent of the parties to a contract is to be determined primarily from the language of the contract itself. In ascertaining whether certain provisions of an agreement are ambiguous, the contract's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed. This court will enforce a written contract according to its plain language if that contract is free from ambiguity.

■ With this in mind, the court turns to the language wherein Time Warner is granted a license to maintain its facilities, "in order to provide CATV and Pay TV services to tenants in the Project." Applying the strict rules of construction against Time Warner, the court determines that the license grants Time Warner the right to maintain its facilities only when Time Warner is providing service to a tenant. Significant to the court's interpretation is the use of the word "provide." Looking to the plain and ordinary meaning of "provide," the court finds that the license does not grant Time Warner the right to store unused facilities at the Atriums forever in order to "offer" service. Rather, the license specifically states to "provide" service. Thus, as to the home run wiring to those apartment units which are not presently used by Time Warner to "provide" cable service, Time Warner has no license. In drafting the Agreement, Time Warner chose the word "provide" and should, therefore, be bound by its generally accepted and understood meaning.

The court next turns to the provision which states that Time Warner desires to maintain its facilities "in order to serve those tenants of Owner *who shall from time to time* pay [Time Warner] for its services." (emphasis added). The court concludes that this provision is, at best, ambiguous. The court agrees with Atrium Partners that the phrase "who shall from time to time" modifies the word "pay." However, even given that interpretation, the court finds that the provision is capable of being understood in two or more possible ways. For example, the parties could have intended, as Atrium Partners suggests, that the clause refers to the fact that cable service customers pay from time to time, generally on a monthly basis, and that Time Warner desires to maintain its facilities only for those tenants who are paying from time to time, *i.e.* those tenants who currently use Time Warner's service. On the other hand, the phrase "from time to time" could also refer to the fact that tenants may discontinue, and then continue, their cable service at various times. Under this interpretation, the clause would mean that Time Warner desires to maintain its facilities for all tenants, including those who currently use Time Warner's service, *i.e.* those who currently pay Time Warner, and those who have discontinued their service.

The court concludes that the phrase "who shall pay from time to time" is ambiguous. The court already determined that ambiguous terms should be construed in favor of Atrium Partners. Therefore, the court determines that "who shall pay from time to time" references the fact that cable service customers pay from time to time (monthly) and that, accordingly, the clause means that Time Warner desires to maintain its facilities only for those tenants who currently use Time Warner's service.

Next, the court addresses the following provision: "It is agreed that the facilities installed by [Time Warner] in the Project or elsewhere on Owner's property shall be and remain the sole and exclusive property of [Time Warner] and shall be treated as personal property of [Time Warner] for all purposes." Time Warner argues this provision exhibits the parties' intent to grant Time Warner a license to maintain its facilities even to those customers who are not current subscribers. However, the court does not believe this provision manifests such an intent. The court considers a situation in which a tenant does not wish to receive cable service in his or her home. At that point, Time Warner still owns the home run wiring, just as the contract prescribes. But Time Warner does not have a *right* to *provide* cable service to that tenant. In other words, Time Warner cannot force its cable services into the homes of unwilling tenants. Thus, the license to provide cable services, or maintain the facilities, extends only to those customers who currently use (and by necessary implication have requested) Time Warner's cable services.

Moreover, the fact that Time Warner owns the home run wiring is not repugnant to the notion that Atrium Partners may require Time Warner to elect to sell, abandon, or remove the wiring. This is, in fact, what the FCC contemplated: "Where an MVPD *owns* the home run wiring in an MDU. . . ." 47 C.F.R. § 76.804(b) (emphasis added). The plain language of the regulation demonstrates that the FCC clearly envisioned § 76.804(b) to apply in situations where the incumbent cable provider actually owns the home run wiring.

Finally, the court turns to the provision stating that "[t]he license herein granted shall remain in effect and may not be terminated by Owner unless and until the Project is destroyed or demolished." This provision prohibits Atrium Partners from terminating the license. In the situation at hand, Atrium Partners is not attempting to terminate the license. Rather, Atrium Partners is enforcing the scope of the license as intended by the parties at the time the Agreement was executed. The Agreement grants Time Warner a license to maintain its facilities only when Time Warner is in fact providing cable services to a tenant. Pursuant to the Agreement, *that* license remains in effect until the Atriums is destroyed or demolished.

In sum, the court finds that the Agreement does not bestow upon Time Warner a legally enforceable right to maintain its home run wiring where Time Warner is not providing cable services to a particular tenant.

### • State Law

Time Warner contends that it has a legally enforceable right to provide cable service to the Atriums residents pursuant to Kan. Stat. Ann. § 58–2553(a)(5). Time Warner correctly points out that the FCC Home Run Wiring Regulations do not apply in cases where the incumbent provider has a legally enforceable right under state law to maintain its facilities. FCC Report ¶ 69 ("[W]e are not preempting any rights the incumbent provider may have under state law.").

Time Warner argues that § 58–2553(a)(5) prohibits Atrium Partners from interfering with Time Warner's provision of cable service to tenants of the Atriums. Section 58–2553(a)(5), which was enacted pursuant the Residential Landlord and Tenant Act, *see* Kan. Stat. Ann. § 58–2540 *et seq.*, provides: "The landlord shall not interfere with or refuse to allow access or service to a tenant by a communication or cable television service duly franchised by a municipality." Kan. Stat. Ann. § 58–2553(a)(5).

■ The court concludes that § 58–2553(a)(5) does not grant Time Warner such a legally enforceable right. The language of the statute merely prohibits Atrium Partners from interfering with service or refusing to allow service to a tenant by Time Warner. A common sense reading of the statute reveals that the statute does not apply in cases where a tenant does not desire Time Warner's cable services. To hold otherwise would be nonsensical: If a tenant is not currently using a cable television company's service, or has not requested such service from a cable television company, there simply is no service to interfere with or to refuse to allow.

In this case, if a tenant is using or requests Time Warner's cable services, Time Warner may use its home run wiring to provide such services. Atrium Partners imposes no impediments to the provision of such services. However, the court is unwilling to read into the statute a right bestowed upon Time Warner to maintain its home run wiring to a particular unit where the tenant of that unit does not want service. The statute was simply not drafted that broadly. Accordingly, the court holds that § 58–2553(a)(5) does not create a legally enforceable right to maintain home run wiring to those tenants where service is neither no longer provided nor requested.

## • Conclusion

The court holds that Time Warner has no legally enforceable right to maintain home run wiring dedicated to those particular units which no longer use Time Warner's cable services. As such, Atrium Partners may invoke 47 C.F.R. § 76.804(b). In accordance with this holding, the court rules as follows:

- As stated on the record at the October 3, 2002 hearing, Everest's Motion to Intervene (Doc. 19) is granted.
- Plaintiffs' request for declaratory and injunctive relief, as set forth in the First Amended Verified Complaint for Declaratory and Injunctive Relief (Doc. 23), is denied.
- Atrium Partners's counterclaim for declaratory judgment, as set forth in the Answer and Counterclaim of Atrium Partners, L.P. to First Amended Verified Complaint for Declaratory and Injunctive Relief (Doc. 25), is granted. Accordingly, pursuant to 47 C.F.R. § 76.804(b), Atrium Partners may require, for each and every home run wire dedicated to a subscriber who chooses an alternative provider's service, Time Warner to remove the wire and restore the Atrium Partners's building consistent with state law; abandon the wiring without disabling it; or sell the wiring to Atrium Partners.

IT IS SO ORDERED.