DECISION
Before this Court is Plaintiffs, CoxCom, Inc., motion for declaratory judgment and for a preliminary injunction and Defendants' — Piceme Real Estate Group, Starlight Communications Holding, Inc. I and Starlight Communications Holding ISP, Inc. (Defendants) — cross-motion for summary judgment and declaratory judgment. Opposing parties have timely filed objections to each respective motion.
 Facts/Travel
CoxCom, Inc. (Cox)[1] owns and operates a franchised cable television system in Rhode Island. Cox provides subscribers with services different from those provided by "free" standard television broadcasting. Specifically, Cox provides basic cable services, which include local broadcast channels, imported signals, and other programming to subscribers for a monthly fee. Additionally, Cox provides premium programming, such as Showtime, Home Box Office (HBO), and Cinemax, for an additional monthly fee.[2] The programming companies deliver their programming to a satellite. Cox then receives the signals by means of satellite antenna dishes or "earth stations" and distributes the programming to its subscribers via its coaxial cable television system.
Rhode Island is divided into 13 "Service Areas" for the purpose of granting cable franchises.[3] The Division of Public Utilities and Carriers (DPUC) serves as the franchising authority for the State of Rhode Island. In accordance with R.I. Gen. Laws §39-19-4, the DPUC issues a "Cable Television Compliance Order Certificate" (Certificate) to cable operators who meet the requisite criteria for each Service Area. As provided in Section 3.1 of the Rules Governing Community Antenna Television Systems of the Division of Public Utilities and Carriers (CATV Rules), each Certificate is for "an indefinite term."[4] Pursuant to Rule 4.1(e) of the CATV Rules, Certificates may not be transferred or assigned. Furthermore, Rule 4.1(e) requires that when one cable company buys out another, the existing Certificate is returned and a new Certificate is issued. Specifically, the rule states, "Upon approval of any such transfer, sale, or assignment, the purchaser, transferee, or assignee shall return all certificates to the Administrator, who shall then issue new certificates in the name of the new certificate holder."
Picerne Realty Group, Inc. (Picerne)[5] is the owner or manager of 34 or 36[6] multifamily properties (Properties) in Rhode Island.[7] The record indicates that since 1982, Picerne has allowed Cox to provide cable service to the tenants of the Properties. Between 1982 and 1990, the owners of at least 27 of Piceme's Properties entered into written contracts for cable television service with predecessors-in-interest to Cox.[8] The record further indicates that Cox, in 1998, entered into a written Agreement with the owner of one of Picerne's Properties, known as "Shady Oaks." These contracts or "Agreements" bore certain similarities and generally allowed the cable provider, whether Cox or one of its predecessors-in-interest, to provide cable television service to the residents of the Properties. The Agreements also contained certain provisions relating to the installation, maintenance, usage, and ownership of the cable wires and equipment.
The record indicates that between 1982 and 1990, when predecessors-in-interest to Cox entered into the Agreements with respect to Properties now owned or operated by Picerne, Cox did not have Certificates to serve any of the Service Areas where the Properties are located. Apparently, sometime after 1990, Cox became the certified cable television service provider in all 13 of Rhode Island's Service Areas.[9]
In order for subscribers to a cable television provider, such as Cox, to receive transmissions for viewing, certain equipment, wiring, or other items known as "facilities" are necessary. These facilities include drop cables[10] trunk cables[11], taps[12] pedestals[13], and junction boxes[14]. As of July 2000, all of these facilities had been installed upon each of the Picerne Properties.[15]
In the summer of 2000[16], Starlight Communications Holding, Inc. and Starlight Communications Holding ISP, Inc. (Starlight)[17] an affiliate of Picerne, introduced a competitive video service in Rhode Island. Starlight constructed a satellite television receiving facility at one of the Properties[18] and entered into an agreement with Verizon to have the signals distributed by fiber optic lines from that facility to 16 other Properties. Verizon's fiber optic line terminates at a central point on each of the 17 properties. The record reflects that Starlight installed its own trunk cables on each of the 17 properties running from the fiber optic termination point to each building on the property. The record also reflects that Starlight installed its own taps, pedestals, and junction boxes at the end of its trunk cables. However, Starlight used the existing drop cables at the Properties to provide its service. Specifically, Starlight connected its subscribers to Starlight's facilities by disconnecting the subscriber's drop cable from Cox's taps and reconnecting that same drop cable to Starlight's taps.
That same summer, on July 27, 2000[19], counsel for Picerne sent a letter to Cox, asking Cox to produce the plans that had been used to install the facilities and invoking the rules for the disposition of home run wiring[20] on a "unit by unit" basis under 47 C.F.R. § 76.804(b) (July 27, 2000 Notice). Paragraph (b) provides mechanisms by which a multichannel video programming distributor (MVPD)[21] may elect to sell, remove, or abandon existing home run wiring in a multiple dwelling unit (MDU). Pursuant to 47 C.F.R. § 76.804(c), "the provisions in paragraph . . . (b) of that section shall apply unless and until the incumbent provider (Cox) obtains a court ruling or an injunctionenjoining its displacement within 45 days following the initial notice."[22]
One month later, on August 23rd, Cox responded with a letter which indicated that contracts between Picerne and Cox precluded Starlight from using any equipment at eight particular Properties.[23] The letter further indicated that Picerne should cease interfering with Cox's provision of services, and asserted that Cox would act to protect its contractual rights if interference continued.
Within one week of the Cox responsive letter, on August 29th, counsel for Picerne and Cox met in Atlanta to discuss the matter, and agreed to meet in Rhode Island thereafter for further discussions. The record indicates that following this meeting, counsel for the Defendants sent Cox a letter on August 31st, indicating that until September 14th, Starlight would suspend any further construction activity pending the outcome of another scheduled meeting between counsel on September 11th. (September 11th was the day the 45-day deadline established in47 C.F.R. § 76.804 (c) and invoked by the July 27 letter would expire).
In the meantime, on September 7th, Cox and Picerne entered into a written agreement (Extension Agreement) to extend the deadline for ten days, until September 21st The Extension Agreement also provided that Cox waived any and all rights to be the exclusive provider of any television or communications services at the Properties. The Extension Agreement further provided that Starlight and Picerne may have access to and use of the cable home wiring at the Properties, provided that Cox have the opportunity to exercise any existing rights under the Code of Federal Regulations before Starlight uses the cable home wiring. Additionally, the Extension Agreement contained provisions for the exchange between counsel of certain documents, including any contracts Cox claims applies to the Properties.
Subsequently, the September 1 1th meeting between counsel took place, apparently leaving unresolved the dispute over usage and ownership of the drop cables.
On February 14, 2002, counsel for Picerne sent a letter to Cox, and as it had previously done on July 27th, Picerne invoked the rules for the disposition of Home Run Wiring[24] on a "unit by unit" basis (February 14, 2002 Notice) under 47 C.F.R. § 76.804(b).
On March 25, 2002, Cox filed a verified complaint for declaratory and injunctive relief together with a motion for a temporary restraining order and preliminary and permanent injunctive relief. The Plaintiffs motion for a temporary restraining order was heard before this Court on March 27, 2002. After oral argument, this Court held that any deadline contained in 47 C.F.R. § 76.804(c) was extended until after the Court ruled on the request for a preliminary injunction. The Court also held that the parties must maintain the status quo at the Properties. The order containing these findings was entered on April 4, 2002.
On June 17, 2002, the Defendants filed an answer and counterclaim. Thereafter, on November 1, 2002, the Defendant Picerne gave the Plaintiff a "building by building" notice (November 1, 2002 Notice) pursuant to47 C.F.R. § 76.804(a). This letter also advised the Plaintiff that Picerne was terminating any and all licenses for Cox's access to the Properties. Additionally, the letter referenced the option available to Cox to exercise its statutory access rights under R.I. Gen. Laws §39-19-10. According to the letter, the termination was to be effective the later of February 1, 2003 or the date this Court decides the Plaintiffs pending injunction motion.
Later that week, on November 7, 2002, the Defendants filed a memorandum of law in opposition to the Plaintiffs motion for a preliminary injunction and Defendant Picerne filed cross-motions for partial summary judgment and a declaration of ownership.
On November 19, 2002, Cox filed an objection to the Defendant Picerne's cross motions for partial summary judgment and a declaration of ownership.
Memoranda of law and supplemental memoranda of law as to all motions have been filed by both the Plaintiff and the Defendants.
The Plaintiff seeks declarative and injunctive relief providing that its ownership and access rights not be terminated, nor its equipment be disturbed at the Properties. Cox advances a number of arguments in support of its motions, the most significant of which is that Cox has established certain contractual rights at the Properties by way of the Agreements entered into between the owners of Piceme's Properties and either Cox or one of its predecessors-in-interest. Cox argues that the FCC regulations purportedly invoked by the Defendants do not apply to a scenario where, as here, the incumbent video services provider has an enforceable right to remain on the property. Cox further contends that the Agreements establish that Cox owns the wire and equipment providing cable service to each dwelling unit and has the right to maintain and service its subscribers at Picerne's Properties. In addition, Cox avers that six of the Agreements provide Cox with the right to continue to serve its customers even after the Agreements expire. Accordingly, the Plaintiff requests a declaratory judgment finding that Cox owns the equipment and wiring at the Defendants' Properties and that Cox is entitled to access to these Properties. Furthermore, the Plaintiff requests an injunction restraining Picerne and Starlight from denying Cox access to the Properties and from interfering with Cox's ownership and use of its internal distribution system at the Properties, as well as from interfering with Cox's maintenance and solicitation of subscribers to its cable service at the Properties.
The Defendants, on the other hand, maintain that the Plaintiff's motion for a preliminary injunction should be denied. In support of this argument, the Defendants contend that the Plaintiff has not offered any proof to show that the Defendants have in any way interfered with the Plaintiffs maintenance and solicitation of subscribers to its cable service at the Properties. The Defendants further argue that Plaintiff has not shown a substantial likelihood of prevailing on the merits, there is an adequate remedy at law for any claims the Plaintiff may have for breach of contract, and the equities favor Starlight's continued use of the drop cables. Finally, the Defendants contend that injunctive relief is barred by laches, and that accordingly, injunctive relief should be denied.
The Defendant Picerne also maintains that the Court should enter partial summary judgment declaring that Picerne owns the drop cables at all of the Properties.[25] To begin with, the Defendant Picerne argues that Picerne owns the drop cables as fixtures. In the alternative, the Defendant Picerne contends that the Plaintiff has abandoned the drop cables on a "unit by unit" basis pursuant to the federal Cable Inside Wire Rules. Moreover, the Defendant Picerne avers that R.I. Gen. Laws § 39-19-10 requires the Plaintiff to relinquish any rights of possession that interfere with the federal Cable Inside Wire Rules. Accordingly, the Defendant Picerne asserts this Court should enter an order declaring that all of the drop cables at the Properties belong to Picerne.
 The Federal Cable Inside Wire Rules
The federal Cable Inside Wire Rules were adopted in a series of orders by the Federal Communications Commission (FCC). The FCC first adopted the rules for the cable home wiring segment of drop cables in 1996.[26] The following year, the rules for the home run wiring segment of the drop cables were adopted.[27]
As evidenced by the separate adoption of rules, the federal Cable Inside Wire Rules divide drop cables into two segments: cable home wiring and home run wiring. Cable home wiring is defined in47 C.F.R. § 76.5(11) as "the internal wiring contained within the premises of a subscriber which begins at the demarcation point. Cable home wiring includes passive splitters on the subscriber's side of the demarcation point, but does not include any active elements such as amplifiers, converter or decoder boxes, or remote control units." Home run wiring is defined in 47 C.F.R. § 76.800 (d) as "the wiring from the demarcation point to the point at which the MVPD's [multichannel video programming distributor] wiring becomes devoted to an individual subscriber or individual loop." The demarcation point is defined in47 C.F.R. § 76.5 (mm)(l) as "a point at (or about) twelve inches outside of where the cable wire enters the subscriber's premises and further described in 47 C.F.R. § 76.5(mm)(2) as "twelve inches outside of . . . where the wire is physically inaccessible at such point(s), the closest practicable point that does not require access to an individual subscriber's dwelling unit." Therefore, the exact location of the demarcation point will establish the point at which the home run wiring ends and where the cable home wiring begins. The federal regulation indicates that the demarcation point is generally about twelve inches outside the unit, but the demarcation point can be extended further away from the unit and closer to the pedestal or junction box depending upon the extent to which the drop cable is "physically inaccessible". The term "physically inaccessible" is defined in47 C.F.R. § 76.5(mm)(4) to describe a location that "[w]ould require significant modification of, or significant damage to, preexisting structural elements, and [w]ould add significantly to the physical difficulty and/or cost of accessing the subscriber's home wiring." The FCC has determined that "wiring embedded in brick, metal conduit or cinder blocks with limited or without access openings would likely be "inaccessible,' wiring enclosed within hallway molding would not." Id.
The Cable Home Wiring Segment of the Drop Cables
The federal Cable Inside Wire Rules which deal with the cable inside wiring segment of the drop cables set forth a mechanism by which the disposition of the cable home wiring upon termination of services in a multiple dwelling unit (MDU) shall be accomplished. 47 C.F.R. § 76.802. This section of the Rules provides that upon termination of cable service by an individual subscriber in a multiple-unit installation, a cable provider shall not be entitled to remove the cable home wiring unless: it gives the subscriber the opportunity to purchase the wiring; the subscriber declines, and neither the MDU owner nor an alternative MVPD has provided reasonable notice to the cable provider that it would purchase the cable home wiring pursuant to this section if and when a subscriber declines. If the cable provider is entitled to remove the cable home wiring, it must do so within seven days of the subscriber's decision, or make no subsequent attempt to remove it or to restrict its use.
The Home Run Wiring Segment of the Drop Cables
The federal Cable Inside Wire Rules which deal with the home run wiring segment of the drop cables set forth a mechanism by which the disposition of the home run wiring upon termination of services in a MDU shall be accomplished. 47 C.F.R. § 76.804. This section of the Rules provides for two types of disposition: "building by building disposition" and "unit by unit disposition." First, according to the building by building rules in 47 C.F.R. § 76.804(a), if the cable company owns the home run wiring, and does not have a legally enforceable right to remain on the premises against the wishes of the property owner, the owner may give the cable company a 90-day written notice that its access to the entire building will be terminated to invoke the procedures in this section. The cable company will then have 30 days to notify the owner in writing of its election as to all the home run wiring inside the building. The cable company may elect to remove the wiring within 30 days of the end of the 90-day notice period or within 30 days of the date of actual termination, whichever occurs first. In the alternative, the cable company may elect to abandon the wiring. The third and final election available to the cable company is to sell the wiring to the building owner. If the election to sell is made, the cable company and the owner shall have 30 days from the date of election in which to negotiate a price. If no price is agreed upon, the cable company must elect to remove the wiring, to abandon the wiring, or to submit the price determination to binding arbitration. In the alternative, if the cable company fails to comply with any of the deadlines established in 47 C.F.R. § 76.804(a), the cable company will be deemed to have abandoned it's home run wiring at the end of the 90-day notice period. 47 C.F.R. § 76.804(a)(3).
Likewise, 47 C.F.R. § 76.804(b) sets forth the rules for unit by unit disposition of home run wiring. To begin with, in the unit by unit rules, when a cable company owns the home run wiring in a MDU and does not have a legally enforceable right to maintain any particular home run wire dedicated to a particular unit on the premises against the MDU owner's wishes, the MDU owner may permit multiple cable companies to compete for the right to use the individual home run wires dedicated to each unit in the MDU. The MDU owner must provide at least 60 days written notice to the cable company of the owner's intention to invoke this procedure. The cable company will then have 30 days to provide a single written election to the owner. The cable company, under the unit by unit rules, may elect to remove the particular home run wires from each subscriber who chooses an alternative cable provider's service. The cable company may elect to abandon the wiring. Or, the cable company may elect to sell the wiring to the owner. In the alternative, if the cable company fails to comply with any of the deadlines established in47 C.F.R. § 76.804(b), the home run wiring shall be considered abandoned, and the cable company may not prevent an alternative cable provider from using the home run wiring immediately to provide service.47 C.F.R. § 76.804(b)(4).
According to 47 C.F.R. § 76.804(c), the procedures set forth for the building by building disposition of home run wiring, as well as the procedures set forth for the unit by unit disposition of home run wiring, shall apply unless and until the cable company obtains a court ruling or an injunction within 45 days following the initial notice enjoining displacement.
In the instant matter, the record reflects that on July 27, 2000, counsel for Picerne sent notice to Cox, for the purpose of invoking the procedures set forth in 47 C.F.R. § 76.804(b) for the unit by unit disposition of home run wiring in the Properties. Within 30 days, on August 23, 2000, counsel for Cox responded, not with an election under the federal Cable Inside Wire Rules, but rather with a direction to Picerne to cease interfering with Cox' contractual rights. Thereafter, counsel for both parties met on several occasions, negotiations took place, and an agreement to extend the deadline for Cox to obtain a court ruling was signed by both Cox and Picerne. No resolution was achieved. On February 14, 2002, counsel for Picerne sent another notice to Cox, for the purpose of invoking the procedures set forth in47 C.F.R. § 76.804(b) for the unit by unit disposition of home run wiring in the Properties. The record indicates that Cox failed to make any election within 30 days (or thereafter, for that matter). Rather, on March 25, 2002, Cox filed the instant action for declaratory and injunctive relief.[28]
 Preliminary Injunction
There are three issues that a hearing judge must address when deciding whether to grant a preliminary injunction. First, the moving party must demonstrate that he or she has a reasonable likelihood of succeeding on the merits of its claim at trial. The Fund for Community Progress v.United Way of Southeastern New England, 695 A.2d 517, 521 (R.I. 1997) (citations omitted). The moving party must only make a prima facie case and need not demonstrate a certainty of success. Id. In order to establish a prima facie case, the moving party must present some "amount of evidence that, if unrebutted, is sufficient to satisfy the burden of proof on a particular issue." Paramount Office Supply Company. Inc. v.D.A. Mclsaac. Inc., 524 A.2d 1099, 1102 (R.I. 1987) (quoting Nocera v.Lembo, 397 A.2d 524 (R.I. 1979)).
Next, the party seeking the preliminary injunction must show that it will suffer some irreparable harm which is imminent and for which no adequate legal remedy exists to restore the plaintiff to its rightful position. The Fund for Community Progress v. United Way of SoutheasternNew England, 695 A.2d at 521. The moving party must present some "statistical evidence or other data" before the hearing judge may find irreparable harm or likelihood of success on the merits. Paramount OfficeSupply Company. Inc. v. D.A. Mclsaac, Inc., 524 A.2d at 1102.
Only after finding a likelihood of success on the merits and an immediate injury should the Court balance the "equities of the case by examining the hardship to the moving party if the injunction is denied, the hardship to the opposing party if the injunction is granted and the public interest in denying or granting the requested relief." The Fund forCommunity Progress v. United Way of Southeastern New England, 695 A.2d at 521; In re State Employees' Unions, 587 A.2d 919, 925 (R.I. 1991). In this analysis, the hearing judge should recognize that:
 "the office of a preliminary injunction is not ordinarily to achieve a final and formal determination of the rights of the parties or of the merits of the controversy, but is merely to hold matters approximately in status quo, and in the meantime to prevent the doing of any acts whereby the rights in question may be irreparably injured or endangered." The Fund for Community Progress v. United Way of Southeastern New England, 695 A.2d at 521 (quoting Coolbeth v. Berberian, 313 A.2d 656, 659 (R.I. 1974)) (emphasis added).
The Court must deny a preliminary injunction when the moving party fails to meet the requirements set forth above by a preponderance of the evidence. Paramount Office Supply. Inc. v. D.A. Mclsaac, Inc., 524 A.2d at 1102. For instance, if the moving party fails to establish a likelihood of success on the merits, the Court's analysis ends there. If the moving party does not present a prima facie case, there is no need to consider a balance of the equities. The analysis is complete and a preliminary injunction must be denied. The Fund for Community Progress v.United Way of Southeastern New England, 695 A.2d at 521; Paramount OfficeSupply Company. Inc. v. D.A. Mclsaac, Inc., 524 A.2d at 1102.
Finally, a preliminary injunction is an "extraordinary remedy." In reState Employees' Unions, 587 A.2d 919, 925 (RI. 1991) (quoting Brown v.Amaral, 460 A.2d 7, 10 (R.I. 1983)). Preliminary injunctions are generally disfavored when their effect grants the ultimate relief sought by the moving party. S.W. Industries. Inc. v. Aetna Casualty SuretyCompany, 646 F. Supp. 819, 823 (D.R.I. 1986) (citations omitted).
The Plaintiff Cox seeks a preliminary injunction preventing the Defendants from owning, operating, and maintaining its cable system on the Defendant Picerne's Properties; from interfering with Cox's operation and maintenance of its internal distribution system at the Properties; and from interfering with Cox's maintenance and solicitation of subscribers to its cable service at the Properties. In support of its motion, the Plaintiff avers the Agreements provide Cox with the right to maintain, own, and service its equipment and wiring at the Properties. Therefore, argues Cox, any attempt by the Defendants to interfere with that right is subject to injunctive relief.
In support of its position, Cox advances two primary arguments. First, Cox argues that the Agreements between the parties provide Cox with ownership of all the relevant equipment and wiring. Moreover, contends Cox, the federal regulations do not apply when, as here, the cable provider has a "legally enforceable right", such as to prevent the application of 47 C.F.R. § 76.804(b). Cox argues that pursuant to the Agreements, Cox owns the drop cables; that Cox has the right to remain on Picerne's Properties; and that Cox enjoys the right to maintain and service its subscribers at the Properties. In light of the provisions of the Agreements, Cox argues, Cox has the right to maintain its property at the Properties and the FCC regulations do not apply. Therefore, Cox avers, the Defendants are not entitled to invoke the procedures under47 C.F.R. § 76.804(b) for the unit by unit disposition of home run wiring in the Properties. Nor, Cox maintains, are the Defendants entitled to invoke the procedures under 47 C.F.R. § 76.802, governing the disposition of cable home wiring. Instead, argues Cox, the Defendants should be restrained from interfering with Cox's contractual rights under the Agreements.
In the alternative, Cox urges this Court to apply the holding recently announced by the United States District Court for the Southern District of New York. CSC Holdings. Inc. v. Westchester Terrace, 235 F. Supp.2d 243
(S.D.N.Y. 2002). Cox argues that the CSC Holdings Court concluded that if the incumbent cable service provider retains the right to service so much as one customer in the building, the federal Cable Inside Wire Rules do not apply. Cox cites generously from the CSC Holdings case in support of its position that since Cox retains the right to service at least one customer in each of the Defendant's Properties, that the federal Cable Inside Wire Rules should not apply in the instant matter. Therefore, Cox argues, the Defendants should be restrained from invoking any such inapplicable rules and from interfering with the contractual rights of Cox.
The Defendants, on the other hand, contend that the Plaintiffs request for a preliminary injunction should be denied since the Plaintiff has failed to establish any of the necessary elements required by law for the issuance of injunctive relief. That is, the Defendants argue that the Plaintiff has not shown a substantial likelihood of prevailing on the merits; that there is an adequate remedy at law for any claims the Plaintiff might have for breach of contract; and that the equities favor Starlight's continued use of the drop cables. Additionally, the Defendants contend that injunctive relief is barred by laches.
Specifically, the Defendants argue that the Agreements that Cox relies so mightily upon do not provide Cox with any property interest at all, let alone a property interest sufficient to meet the standard of a "legally enforceable right", as required by 47 C.F.R. § 76.804(b). To begin with, the Defendants contend that the Agreements are no longer in effect, since they have either expired by their own terms, or terminated with the end of the original franchise and the return of the Certificate. Cox, the Defendants argue was a party to only one of the existing Agreements, and that Agreement may have expired by its own terms in April, 2003. Rather, argue the Defendants, predecessors-ininterest to Cox entered into Agreements with Picerne to provide cable service. Therefore, maintain the Defendants, there are no Agreements in effect between Cox and Picerne. The Defendants also point out that of the 36 Properties at issue, 8 Agreements were apparently oral.[29] Since there is no evidence as to what those alleged oral agreements contained, argue the Defendants, there can be no enforceable right implied as to those Properties.
In the alternative, the Defendants argue, that even if the Agreements were in effect, they do not provide Cox with a "legally enforceable right", as required by 47 C.F.R. § 76.804(b). First, the language contained in each of the Agreement is different, one from the other. However, the Defendants point out, many of the Agreements contain language specifically conferring ownership of the "inside wiring" upon the property owner. Therefore, the Defendants contend, the Agreements do not provide Cox with ownership of "all the equipment and wiring"; thus, Cox does not have a legally enforceable right in this respect. More significantly, argue the Defendants, the Agreements do not provide Cox with a property interest, but rather with a revocable license which the Defendants have terminated.
Finally, the Defendants contend that not only was the CSC Holding case decided erroneously, but that a more recent decision from the United States District Court for the District of Kansas offers a persuasive analysis of facts akin to the case at bar. Time Warner EntertainmentCompany. L.P. v. Atrium Partners, L.P., 232 F. Supp.2d 1257 (D.Kan. 2002). The Defendants aver that according to Time Warner Entertainment, the entitlement of a cable provider to service one or more subscribers does not provide the cable company with a legally enforceable right sufficient to prevent application of 47 C.F.R. § 76.804(b).
In the instant matter, this Court finds that Cox does not have a legally enforceable right sufficient to prevent the application of47 C.F.R. § 76.804(b). Accordingly, this Court also finds that the Defendants may properly invoke the federal Cable Inside Wire Rules with regard to drop cables at the Properties at issue. In reaching this conclusion, this Court takes into account the various arguments posed by both the Plaintiff and the Defendants.
To begin with, this Court notes that pursuant to the Cable Inside Wire Rules, the procedures for the disposition of home run wiring are different from the procedures for the disposition of cable home wiring. This Court further notes that the procedures for building by building disposition of home run wiring are different from the procedures for unit by unit disposition of the wiring. First, the invocation of the procedures for building by building disposition of the home run wiring is subject to any "legally enforceable right [of the cable provider] to remain on the premises against the wishes of the MDU owner."47 C.F.R. § 76.804(a). However, the invocation of the procedures for unit by unit disposition of the wiring is subject to any "legally enforceable right to maintain any particular home run wire dedicated to a particular unit on the premises against the MDU owner's wishes."47 C.F.R. § 76.804(b). On the other hand, the procedures for the disposition of cable home wiring are not subject to any legally enforceable right 47 C.F.R. § 76.802.
The record reflects that by operation of the February 14, 2002 notice, Picerne sought to invoke the procedures for unit by unit disposition of the home run wiring and the cable home wiring. The record also reflects that by operation of a November 1, 2002 notice, Picerne sought to invoke the procedures for building by building disposition of the home run wiring and the cable home wiring.
In light of the procedures promulgated by the FCC for the disposition of cable home wiring, this Court need not find whether any legally enforceable right bars the invocation of 47 C.F.R. § 76.802, since none is required. Accordingly, this Court finds that Picerne may properly invoke the procedures set forth for the disposition of cable home wiring segment of the drop cables.
Turning to the home run wiring segment, this Court must consider whether Cox has a legally enforceable right sufficient to bar the invocation of either 47 C.F.R. § 76.804(a) (building by building disposition) or 47 C.F.R. § 76.804(b) (unit by unit disposition). The record reflects that Picerne sought to invoke the building by building procedures by operation of a November 1, 2002 notice sent to Cox. Cox maintains, however, even in its April 4, 2003 memorandum of law in support of its objection to Defendant's cross-motion for partial summary judgment, that Picerne "specifically invoked the unit by unit methodology, and specifically did not invoke the building-bybuilding home run wiring rules." The record does not contain any further supplementary papers filed by Cox. This Court does not know why, notwithstanding the different standards for building by building disposition versus unit by unit disposition, Cox preferred to address solely the legally enforceable right that it claims is sufficient to bar the invocation of47 C.F.R. § 76.804(b). Regardless, based upon the record as it exists, this Court finds that Cox has failed to prove that is has a legally enforceable right sufficient to bar the invocation of the building by building disposition of home run wiring. Accordingly, Picerne may properly invoke the procedures set forth in 47 C.F.R. § 76.804(a).
As to the procedures set forth for the unit by unit disposition of home run wiring, Cox asserts that recent case law bars a MDU owner in the position of Picerne from invoking 47 C.F.R. § 76.804(b) and that Cox has a legally enforceable right sufficient to bar the invocation of this provision of the Cable Inside Wire Rules.
Beginning with the argument that Cox advances which is based upon the holding in the CSC Holdings case, this Court finds that any such reliance is misplaced. In October of 2002, the United States District Court for the Southern District of New York became the first federal court to publish a decision interpreting the federal Cable Inside Wire Rules. CSCHoldings. Inc., 235 F. Supp.2d at 243. The CSC Holdings Court held that "[i]f the incumbent [cable company] retains the right to service so much as one customer in the building, [the unit by unit rules of 47 C.F.R. § 804(b)] simply do not apply." Id. at 248. With this holding in mind, Cox argues that in the instant matter, Cox retains the right to service at least one customer in each building; therefore, the provisions of 47 C.F.R. § 76.804(b) do not apply and Picerne should be restrained from invoking this provision.
One month after CSC Holdings was decided, the United States District Court for the District of Kansas became the second federal court to publish a decision interpreting the federal Cable Inside Wire Rules. TimeWarner Entertainment Company. L.P., 232 F. Supp.2d at 1257. The TimeWarner Court came to the opposite conclusion from that of its sister court in New York, holding that a building owner could invoke the unit by unit procedures of 47 C.F.R. § 76.804(b) even if the incumbent cable company still had the right to serve subscribers at the property. Id. In reaching its conclusion, the court opined:
 "Surely the FCC did not contemplate the requirement that every single individual customer must discontinue service with the incumbent cable service provider before an MDU can invoke § 76.804(b) and use that incumbent's home run wiring. Such a requirement would create an unnecessary obstacle to allowing individual MDU residents the option of choosing between alternative cable service providers, thereby frustrating the FCC's stated purpose of promoting competition. This court therefore concludes that § 76.804(b) may be invoked by an MDU owner notwithstanding that an incumbent MVPD retains the right to service some of the MDU residents."
Id. at 1263.
In the case at bar, Picerne has sought to invoke both the unit by unit provisions pursuant to 47 C.F.R. § 76.804(b) as in CSC Holdings andTime Warner, as well as the building by building provisions, pursuant to47 C.F.R. § 76.804(a). With the holdings in both CSC Holdings andTime Warner in mind, this Court has undertaken its own examination of the Cable Inside Wire Rules, to determine first whether Picerne may properly invoke the unit by unit provisions pursuant to 47 C.F.R. § 76.804(b). A thorough and complete analysis of the federal regulations reveals that the Time Warner court reached the only conclusion that would be consistent with the purpose of the FCC in enacting the legislation. As the Time Warner court noted, the FCC was concerned that the inability of MDU owners to use existing home run wiring deters consideration of alternative providers. Time Warner Entertainment. L.P., 232 F. Supp.2d at 1261. In promulgating the Home Run Wiring Regulations then, the FCC determined that establishing procedures for the disposition of MDU home run wiring upon a tenant's termination of service is a "necessary, "appropriate, and reasonable' method to fulfill [the Act's] mandate of reasonable cable rates." Report and Order and Second Further Notice of Proposed Rulemaking in the Matter of Telecommunications Services Inside Wiring, CS Docket No. 95-184, MM Docket No. 92-260, FCC No. 97-376 (October 17, 1997) (FCC Report). "Accordingly, the FCC Home Run Wiring Regulations were promulgated, providing in essence that when an individual subscriber voluntarily terminates cable service, the MDU owner has the right to purchase the cable home run wiring for use by competing service providers, subject only to an enforceable legal right of the incumbent provider to maintain its home run wiring." Time WarnerEntertainment. LP., 232 F. Supp.2d at 1261. In light of the purpose of the FCC and the language of the regulation, together with the reasoning and holding in Time Warner, this Court concludes that the proper interpretation of the Cable Inside Wire Rules is that a building owner may invoke the unit by unit procedures of 47 C.F.R. § 76.804(b) even if the incumbent cable company still has the right to serve subscribers at the property. Otherwise, this Court notes, a competing cable company would have to wait until and if every single subscriber in a MDU terminated service with the incumbent cable company before the MDU owner would be permitted to invoke the procedures of 47 C.F.R. § 76.804(b). This court finds that this would lead to an absurd result; for instance, if 99 out of 100 subscribers terminated service with Cable Company A on January 1, 2004, any cable company desiring to compete with Cable Company A would have to wait until and if the one remaining subscriber terminated service before the MDU owner could invoke the procedures of47 C.F.R. § 76.804(b). In the meantime, the competing cable company would not be permitted to use the home run wiring in any of the residences of any of the other 99 subscribers who terminated service with Cable Company A. Additionally, those 99 subscribers may be deprived of the benefit of a competing cable company, since the company may not feasibly be able to install additional wiring. In any event, this Court finds that such a scenario is precisely what the FCC was seeking to avoid in promulgating the Cable Inside Wire Rules. Therefore, this Court holds that a building owner may invoke the unit by unit procedures of47 C.F.R. § 76.804(b) even if the incumbent cable company still has the right to serve subscribers at the property. Accordingly, this Court finds that Picerne may properly invoke the unit by unit procedures of47 C.F.R. § 76.804(b) even though Cox still has the right to serve subscribers at the Properties. In so holding, this Court adopts the rationale set forth by the Time Warner Court, and concludes that the reasoning in Time Warner supports the stated purpose of the FCC. This Court declines to follow the reasoning articulated in CSC Holdings, finding that the holding in CSC Holdings in contrary to the FCC's purpose in promulgating the Cable Inside Wire Rules.
As Cox points out, however, if this Court finds, as it has, that the Cable Inside Wire rules may be invoked even if an incumbent cable company still has the right to serve subscribers at the property, the right of the MDU owner to invoke such procedures is subject to an enforceable legal right of the incumbent provider to maintain its wiring. In support of its alleged legally enforceable right,[30] Cox relies on the Agreements.
Upon an inspection of the record, this Court concludes that these Agreements may be divided into three categories. First, there are 8 Properties for which there are no written agreements.[31] The record reflects that Picerne characterizes these Agreements as "oral agreements". The record also reflects that Cox does not specifically address them at all. Rather, the record reveals that Cox consistently refers to "the Agreements" as one lump package, save only to point out the differences in the Shady Oaks Agreement.[32] Absent in the record is any evidence as to their existence, let alone what the terms of any of the alleged agreements were, or with whom they were executed.
Next, the record reflects that one of the written Agreements, the Shady Oaks Agreement, was executed between Cox and Picerne. The record also reflects that the Shady Oaks Agreement contains the following plain and unambiguous language: "internal wiring shall at all times be and remain in the [o]wner."
Finally, the record contains evidence of 27 written Agreements between predecessors-in-interest to Cox and the owners of Picerne's Properties. However, while these 27 written Agreements are contained in the record, the record is entirely silent as to all matters relevant to their purported effectiveness. To begin with, the record does not contain any information relative to whether Cox directly bought out these predecessors-in-interest, whether there were any intervening predecessors-in-interest, and under what terms and conditions those apparent buyouts took place, nor does the record disclose if Cox legally became subject to the burdens, and/or entitled to the benefits of the preexisting agreements. For example, the record does not disclose whether Cox bought Heritage Cablevision, Inc., or whether ABC Cable bought Heritage Cablevision, Inc., and then Cox bought ABC Cable. Furthermore, the record does not disclose under what terms Cox acquired any of its predecessors-in-interests. For instance, absent in the record is any buyout agreement at all, let alone a buyout agreement under which Cox agreed to be subject to all preexisting Agreements. Moreover, the record is not helpful in educating the Court as to whether the Agreements are in effect after the original franchise returns its Certificate upon a buyout. Actually, the record does not even indicate whether the predecessors-in-interest to Cox ever did return their Certificates upon their respective buyouts.
Taking into consideration all the Agreements, this Court finds that the record does not contain sufficient information to determine whether or not these Agreements are in effect. Accordingly, this Court declines to rule at this time on the issue of the effectiveness of the Agreements.
Any such ruling, however, is not necessary to determine the outcome of the issue before the Court, since this Court does find that even if the Agreements are effective, they do not provide Cox with an enforceable right sufficient to prevent the application of the federal Cable Inside Wire Rules. Rather, even if the Agreements are effective, at best they provide Cox with a revocable license, rather than any property interest.
As the Defendants point out, the 28 written Agreements, as originally executed, may have given the original cable company a property interest in the Properties, an easement in gross, because they were exclusive agreements. The Defendants direct this Court's attention to a 1938 Massachusetts Supreme Court case, which differentiated between a non-exclusive license, which is terminable at the will of the landowner, from an exclusive license, which vests the licensee with a property interest in the land. Baseball Pub. Co. v. Bruton, 18 N.E.2d 362,302 Mass. 54 (1938).
However, the record reflects that on September 11, 2000, Cox and Picerne entered into an Extension Agreement, which contains the following language:
 "Waiver of Exclusivity. Cox hereby waives any and all rights it may have or hereafter acquire, whether arising under contract or otherwise, to be the sole and exclusive provider of any television or communications services at the Properties . . . this waiver is without prejudice to Cox's claims to have exclusive access and ownership of its equipment."
This Court finds that the plain language of the Extension Agreement must be construed to mean that Cox relinquished any right it may have had under the Agreements to be an exclusive provider of cable services at the Properties. By operation of this Extension Agreement, this Court finds that Cox transformed the 27 written Agreements that were allegedly exclusive agreements, into specifically non-exclusive agreements. Accordingly, this Court finds that Cox transformed what may have been a property interest in the Properties, into a revocable license in the Properties.
This proposition has most recently been discussed in the Time Warner
case. Time Warner Entertainment, L.P., 232 F. Supp.2d at 1268. In TimeWarner, there was an effective agreement between Time Warner, the cable provider, and the MDU owner. Id. The Time Warner Court held that "The Agreement grants Time Warner a license to maintain its facilities only when Time Warner is in fact providing cable services to a tenant . . . [T]he court finds that the Agreement does not bestow upon Time Warner a legally enforceable right to maintain its home run wiring where Time Warner is not providing cable services to a particular tenant." Id.
Thus, even if the Agreements are currently in effect, Picerne can still terminate them, which it sought to do by operation of the November 1, 2002 notice. This notice contains the following language:
 "This letter serves as notice pursuant to 47 C.F.R. § 76.804(a)(1) any and all rights you claim to install, operate or maintain any cable television equipment at any of the Properties by operation of any written or oral agreement or understanding is terminated effective on the later of ninety (90) days from your receipt of this letter or the date the Rhode Island Superior Court rules on the petition of CoxCom, Inc. for a preliminary injunction . . .
Consequently, if the Agreements are found to be in effect, but nonetheless terminated, then Picerne may be liable in money damages for a breach of contract arising out of its termination.[33] An action for money damages, however, is Cox's proper remedy posttermination, rather than equitable relief, as herein sought.
Taking into consideration the various arguments advanced by counsel, both in support of a preliminary injunction, and opposed thereto, this Court finds that the Plaintiff Cox has failed to meet the requirements necessary for the imposition of injunctive relief. This Court has concluded that no enforceable right exists that would render the federal Cable Inside Wire Rules either inapplicable or improperly invoked. In light of this conclusion, this Court finds that Cox has failed to show a substantial likelihood of success on the merits. Pursuant to the mandate of Paramount Office Supply Company, this Court's analysis must end there. Accordingly, the Plaintiffs request for a preliminary injunction is denied.
 Declaratory Judgment
Under the Uniform Declaratory Judgments Act, this Court has the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. G.L. 1956 § 9-30-1. "This Court may also grant further affirmative relief based on the declaratory judgment "whenever necessary or proper' provided subsequent "supplementary proceedings' are brought pursuant thereto." Capital Properties. Inc. v. State, 749 A.2d 1069, 1080 (R.I. 1999)(citing Sousav. Langlois, 196 A.2d 838 (R.I. 1964)). The purpose of declaratory judgment actions is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations."Providence Teachers Union v. Napolitano, 690 A.2d 855 (R.I. 1997). Seealso Firemen's Fund Insurance Co. v. E.W. Burman, Inc., 391 A.2d 99
(R.I. 1978) ("[t]he obvious purpose of the Uniform Declaratory Judgment[s] Act is to facilitate the termination of controversies"). The Rhode Island Supreme Court has consistently held that "[t]he decision to grant or to deny declaratory relief under the Uniform Declaratory Judgments Act is purely discretionary." Rhode Island Orthopedic Societyv. Blue Cross Blue Shield of Rhode Island, 748 A.2d 1287, 1289 (R.I. 2000)(citing Sullivan v. Chafee, 703 A.2d 748, 751 (R.I. 1997)).See also Woonsocket Teachers' Guild Local Union 951. AFT v. WoonsocketSchool Committee, 694 A.2d 727, 729 (R.I. 1997); Vincent Co. v. FirstNat'l Supermarkets. Inc., 683 A.2d 361, 362 (R.I. 1996); Lombardi v.Goodyear Loan Co., 549 A.2d 1025, 1027 (R.I. 1988). The procedure for obtaining a declaratory judgment authorized by statute is governed by Super. R. Civ. P. 57.
In the instant matter, both the Plaintiff and the Defendant Piceme request that this Court enter declaratory judgment. The Plaintiff asks this Court to enter declaratory judgment finding that Cox owns the equipment and wiring at the Properties and that Cox is entitled to access to the Properties. The Defendant, on the other hand, urges this Court to enter declaratory judgment finding that Picerne owns the drop cables at the Properties.
The Fixtures Argument
To begin with, Defendant Picerne argues that this Court should find that the drop cables at the Properties are fixtures that belong to Piceme. In support of this position, Picerne contends that the drop cables have been annexed to the Properties. Furthermore, argues Picerne, the drop cables are used as part of the Properties for residences. Finally, Picerne avers that the intention of the cable company who installed the drop cables was to make them a permanent accession to the freehold because they have never been removed when not in service.
The Plaintiff, on the other hand, maintains that the drop cables are not fixtures because the Agreements in place between the parties provide that the cables and other related equipment all belong to Cox. The Plaintiff dismisses the argument of the Defendant rather quickly, electing to rely solely on the Agreements as evidence to overcome Picerne's fixture argument.
In 1977, the Rhode Island Supreme Court articulated a "modern" standard to test whether a particular subject matter was a fixture as a matter of law. Prospecting Unlimited, Inc. v. Norberg, 376 A.2d 702, 705 (1977). InProspecting Unlimited. Inc., the Court announced that when confronted with the determination as to whether something is a fixture, three general tests are to be applied. Id. "First, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold." Id.
Prior to Prospecting Unlimited. Inc., the Rhode Island Supreme Court had dealt with fixture arguments on numerous occasions and had provided guidance as to how a fixture must be determined. As the Plaintiff points out, one such occasion was in 1954, in a case entitled, Powers v.Harvey, 81 R.I. 378, 103 A.2d 551 (R.I. 1954). In Powers, the Court addressed the issue of whether houses erected by fraternities upon land owned by the University of Rhode Island were owned by the school or by the fratermties and thus subject to taxation. Id. The Powers Court held that the character of property may be fixed by contract with the owner of the real estate when the article is installed. Id. As the Defendant Picerne points out, however, the Powers Court also held that the language of the contract is one of several considerations in determining whether something is a fixture. Id. In particular, the Powers Court noted that the mode of annexation and the use of the facility are also relevant to the fixture inquiry. Id.
The Rhode Island Supreme Court has not yet had the opportunity to address fixture arguments as they pertain to drop cables. However, other courts around the country have begun to engage in such inquiries. First, in 1983, the Nebraska Supreme Court ruled that drop cables are fixtures because the cable company never made any effort to remove them when they were not in use. T-V Transmission. Inc. v. Co. v. Board of Equalizationof Pawnee County, 338 N.W.2d 752 (1983).
Nine years later, in 1992, the Maryland Court of Appeals followed the reasoning of T-V Transmission, holding that drop cables were fixtures.State Department of Assessments and Taxation v. Metrovision of PrinceGeorge's County Inc., 607 A.2d 110 (Md. Ct. App. 1992). In this case, the court found that the cable company had intended to make the cables a permanent accession to the subscriber's home as evidenced by the failure of the company to remove the drop cable after termination of services. Id.
That same year, in 1992, the Ohio Court of Appeals addressed the question of drop cables as fixtures in a case involving the Ohio affiliate of the Plaintiff in the instant matter. Metro. Cablevision.Inc. v. Cox Cable Cleveland Area, 78 Ohio App. 3rd 273 (Ohio Ct. App. 1992). In Cox Cable Cleveland, Cox installed the drop cables in the subscriber's home, under an installation agreement which provided that the equipment installed by Cox Cable Cleveland remains their property and is to be returned when the service is terminated. Id. The Cox CableCleveland Court held that the drop cables were fixtures because Cox had manifested its intent that the drop cables become a permanent part of the realty by failing to remove the drop cables when they were not in use.Id. The court also described in detail the manner in which the drop cables were installed, and was convinced that the cables could not be removed without damaging the property in which the subscriber dwelled.Id.
Most recently, in 1996, a Michigan Court of Appeals held that drop cables were fixtures. Comcast Cablevision of Sterling Heights. Inc. v.City of Sterling Heights, 553 N.W.2d 627 (Mich. Ct. App. 1996). TheComcast Cablevision Court applied similar reasoning as courts in Nebraska, Maryland, and Ohio had previously, and concluded that the cable company must "relinquish control" of cable wiring to a subscriber exercising the right to purchase the wiring, especially when the subscriber agreement is terminated. Id. at 630.
In the matter before this Court, drop cables have been installed in and around the subscribers' residences within the Defendant's Properties. The record does not contain any reference as to who installed the cables, let alone the manner in which the cables have been installed. For instance, it is unknown whether the drop cables were installed within brick or cinder block, or in hallway moldings. The record does not indicate whether the drop cables were installed in ceilings or in walls or in both. Silent is the record as to the critical components related to where exactly those drop cables are.
The record is also bereft of specific evidence or any manner of detail in terms of potential damage to the property in the event of removal of the drop cables. According to the affidavit of Mike Derderian filed by the Defendant, the drop cables are "permanently attached to the Properties in such a manner that the Property would be damaged if the [drop cables] . . . were removed." This statement is also contained in the statement of material facts not in dispute filed by the Defendants. This statement is not supported by any particular evidence. On the other hand, it is not contradicted by the Plaintiff.
Absent also in the record is evidence regarding exactly which subscribers have terminated service with Cox, and at which Properties these subscribers either currently reside or formerly resided. Both the Plaintiff and the Defendants make passing references to, and sweeping generalizations, as to the notion that "most" original subscribers have ceased to live at the Picerne Properties, and that "virtually all" of the former tenants "must have sent termination notices to Cox." In addition, according to the Mike Derderian affidavit filed by the Defendants, "there has been a nearly complete turnover of residents in the Properties since March 1996." No evidence of these transitions is contained in the record however, nor is there any evidence of how many termination notices have been provided to Cox by residents.
The record also reflects an existing dispute as to the intent of the Plaintiff in its failure to remove the drop cables upon termination of service by a subscriber. The Defendant avers that by its failure to remove the cables at the termination of services, that the only conclusion that this Court may reach is that Cox intended to make the drop cables a permanent accession to the property, and therefore, a fixture. The Plaintiff, on the other hand, maintains that it intended no such thing. On the contrary, the Plaintiff argues that the Agreements contain evidence that Cox intended to retain the cables as property of its own. These Agreements, however, are the source of much dispute as well. For instance, the Defendants contend that all but one has been terminated and are no longer in effect, since they were contracts not between Cox and Picerne, but rather between a predecessor-in-interest to Cox and Picerne. Therefore, argue the Defendants, when the original party to the contract returned its Certificate to the DPUC as it must when it is bought by another company, the Agreements terminated by their own terms. In addition, the Defendants argue, even if the Agreements are in effect, the language in each Agreement is very different, and many Agreements actually contain language granting ownership of the "internal wiring" to the property owner. Furthermore, the Defendants point out, apparently 8 of the 36 Properties entered into oral agreements, as opposed to written agreements. The record contains no evidence of the existence, content, or nature of any oral agreements, and as this Court has held earlier in this decision, the record does not contain sufficient information for the Court to determine whether or not the Agreements are in effect.
With the guidance of the courts in Nebraska, Maryland, Ohio, and Michigan in mind, this Court is persuaded that the drop cables in the instant matter may, at some point, be proved to be fixtures under the standard articulated by the Rhode Island Supreme Court in ProspectingUnlimited. Inc.. The state of the record as it presently exists, however, leaves the relevant inquiries unanswered. Accordingly, this Court will, at this time, decline to hold that the drop cables at issue are fixtures.
The Abandonment Argument as to the Home Run Wiring Segment
In the alternative, the Defendant Picerne argues that counsel for Picerne properly invoked the procedures for building by building disposition of home run wiring as set forth in 47 C.F.R. § 76.804(a). Therefore, argues the Defendant, the burden then shifted to Cox to make an election as required under 47 C.F.R. § 76.804(a). Cox failed to make any such election, the Defendant avers, and is therefore considered to have abandoned the home run wiring according to the provisions of47 C.F.R. § 76.804(a)(4).
Defendant Picerne further argues that the home run wiring in the Properties at issue has been abandoned by operation of47 C.F.R. § 76.804(b)(4). Specifically, Defendant Picerne avers that counsel for Picerne properly invoked the procedures for unit by unit disposition of home run wiring as set forth in 47 C.F.R. § 76.804(b). Therefore, argues the Defendant, the burden then shifted to Cox to make an election as required under 47 C.F.R. § 76.804(b). Cox failed to make any such election, the Defendant avers, and is therefore considered to have abandoned the home run wiring according to the provisions of47 C.F.R. § 76.804(b)(4).
In the alternative, the Defendant Picerne concedes, Cox could avoid operation of 47 C.F.R. § 76.804(a)(4) or 47 C.F.R. § 76.804(b)(4) by obtaining a court order as set forth in 47 C.F.R. § 76.804(c). The Defendant also concedes that pursuant to an order of this Court entered on April 4, 2002, any deadline contained in 47 C.F.R. § 76.804(c) was extended until after this Court rules on the request for a preliminary injunction.
Cox, on the other hand, maintains that the federal regulations are simply inapplicable to the instant matter, since the Agreements provide Cox with an enforceable right sufficient to prevent the application or invocation of 47 C.F.R. § 76.804.
As this Court has earlier discussed, the record reflects that an absence of evidence exists regarding exactly which subscribers have terminated service with Cox, and at which Properties these subscribers either currently reside or formerly resided. This Court has noted that generalizations have been posited by both parties, indicating that "virtually all" of the original subscribers have moved since February 1996, and that those residents "must have terminated service" with Cox upon their departure from the particular Picerne Property unit.
This Court has now ruled that the Plaintiff is not entitled to injunctive relief. Hence, the extension of the deadline set forth in47 C.F.R. § 76.804(c), shall heretofore cease. Accordingly, this Court finds that pursuant to 47 C.F.R. § 76.804(a)(4) and47 C.F.R. § 76.804(b)(4), the Plaintiff is considered to have abandoned the home run wiring segment of the drop cables at the particular units at the Properties, at which residents/subscribers have actually terminated service with Cox. This holding is specifically conditioned upon Picerne filing with the Court evidence sufficient to prove that for each and every home run wire Picerne seeks to deem abandoned, that particular subscriber/resident has terminated services with Cox.[34]
The Abandonment Argument as to the Cable Home Wiring Segment of the DropCables
Defendant Picerne further argues that the cable home wiring segment of the drop cables has been abandoned by operation of 47 C.F.R. § 76.802. In support of this argument, Picerne contends that since February 1996 when 47 C.F.R. § 76.802 went into effect, almost all of the rental units at the Properties have been vacated and rented out to new residents. Thus, continues the Defendant's argument, the exiting tenants terminated their service with Cox, and 47 C.F.R. § 76.802 contains specific procedures for the disposition of cable home wiring upon the voluntary termination of service by a subscriber. Because Cox has not provided any notices to any subscribers, pursuant to47 C.F.R. § 76.802(b), Cox is deemed to have abandoned the cable home wiring pursuant to 47 C.F.R. § 76.802(e).
The Defendant Picerne also argues that pursuant to its November 1, 2002 building by building notice of intent to invoke the procedures for the disposition of home run wiring under 47 C.F.R. § 76.804(b), Picerne also gave a termination notice on behalf of the individual subscribers, as provided in 47 C.F.R. § 76.804(a)(4). Picerne further avers that pursuant to this provision, upon receipt of a termination notice from the building owner, the cable company is required to offer to sell the cable home wiring segment of the drop cables to the building owner within 30 days of receipt of the termination notice. If this offer is not timely made, Picerne contends, the cable company is deemed to have abandoned the cable home wiring segment, pursuant to 47 C.F.R. § 76.804(a)(3). Thus, argues the Defendant, since Picerne sent a termination notice to Cox on November 1, 2002, and Cox has failed to offer to sell the cable home wiring to Picerne within 30 days[35], Cox is deemed to have abandoned the cable home wiring segment.
Cox, on the other hand, maintains that the federal regulations are simply inapplicable to the instant matter, since the Agreements provide Cox with an enforceable right sufficient to prevent the application or invocation of 47 C.F.R. § 76.802.
The federal Cable Inside Wire Rules which deal with the cable inside wiring segment of the drop cables set forth a mechanism by which the disposition of the cable home wiring upon termination of services in a multiple dwelling unit (MDU) shall be accomplished. 47 C.F.R. § 76.802. This section of the Rules provides that upon termination of cable service by an individual subscriber in a multiple-unit installation, a cable provider shall not be entitled to remove the cable home wiring unless: it gives the subscriber the opportunity to purchase the wiring; the subscriber declines, and neither the MDU owner nor an alternative MVPD has provided reasonable notice to the cable provider that it would purchase the cable home wiring pursuant to this section if and when a subscriber declines. If the cable provider is entitled to remove the cable home wiring, it must do so within seven days of the subscriber's decision, or make no subsequent attempt to remove it or to restrict its use. The rules go on to provide that when a subscriber contacts a cable operator to voluntarily terminate cable service, the cable operator must inform the subscriber that it owns the home wiring; that it intends to remove the wiring; that the subscriber has the right to purchase the wiring and what the per-foot replacement cost and total charge for the wiring would be. 47 C.F.R. § 76.802(b). If the cable operator fails to provide the information required by 47 C.F.R. § 76.802(b), the cable provider will be deemed to have relinquished immediately any and all ownership interests in the home wiring. 47 C.F.R. § 76.802(e).
Furthermore, this Court notes that the federal Cable Inside Wire Rules which deal with the home run wiring segment of the drop cables set forth a mechanism by which the disposition of the cable home wiring segment may be accomplished upon a building by building notice of intent.47 C.F.R. § 76.804(a)(4). This section of the Rules provides that the MDU owner shall be permitted to exercise the rights of individual subscribers under this subsection for purposes of the disposition of the cable home wiring under 47 C.F.R. § 76.802. These rules provide that when a MDU owner notifies an incumbent provider, under a building by building notice, that the incumbent provider's access to the entire building will be terminated and that the MDU owner seeks to use the home run wiring for another service, the incumbent provider shall, within 30 days, offer to sell to the MDU owner any home wiring within the individual dwelling units. In the alternative, if the MDU owner declines to purchase the cable home wiring, the MDU owner may allow the alternative provider to purchase the wiring. If the MDU owner or the alternative service provider fail to elect to purchase the wiring, the incumbent provider must then remove the cable home wiring within 30 days of actual service termination, or make no subsequent attempt to remove it or to restrict its use.
As the Court has noted, the record reflects that there has clearly been some number of subscribers who have terminated their service with Cox. The record, however, is not clear as to whom they are, how many there are, and exactly what type of notice of termination they provided to Cox upon their departure from the Picerne Property in which they resided. Cox, though, does not dispute that some number of residents has terminated services with Cox since February 1996. Cox also does not allege that it has ever given Picerne the opportunity to purchase any of the cable home wiring at the residents where a former subscriber terminated service. Nor does Cox allege that it has ever removed any of the cable home wiring at these dwellings, whether within the proscribed seven-day period, or any time thereafter.
In light of the record, this Court finds that the cable home wiring at the Picerne Property dwellings at which former subscribers have terminated service with Cox has been abandoned by operation of47 C.F.R. § 76.802(e). This holding is specifically conditioned upon Picerne filing with the Court evidence sufficient to prove that for each and every cable home wire Picerne seeks to deem abandoned, that particular subscriber/resident has terminated services with Cox. * (See footnote #34).
This Court also finds that on November 1, 2002, Piceme properly gave Cox a building by building notice of intent pursuant to47 C.F.R. § 76.804(a), together with a notice of termination of behalf of all individual subscribers pursuant to47 C.F.R. § 76.804(a)(4). This Court further finds that Cox failed to make any offer to sell the cable home wiring, nor did Cox ever seek to remove the cable home wiring. Accordingly, this Court holds that the cable home wiring at all of the Picerne Properties has been abandoned by operation of 47 C.F.R. § 76.804(a)(4).
 Summary Judgment
Super. R. Civ. P. 56 empowers a trial justice, upon proper motion, to enter summary judgment in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, in a proceeding for summary judgment, the court must "examine the pleadings and affidavits in the light most favorable to the nonmoving party to decide whether an issue of material fact exist[s] and whether the moving party [is] entitled to summary judgment as a matter of law." Buonnanno v. Colmar Belting Co., Inc., 733 A.2d 712, 715 (R.I. 1999) (citing Textron. Inc. v. Aetna Casualty and Surety Co.,638 A.2d 537, 539 (R.I. 1994)). The party opposing a motion for summary judgment may not rely upon mere allegations or denials in his or her pleadings. Small Business Loan Fund v. Loft, 734 A.2d 953, 955 (R.I. 1998) (citing Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998)). Rather, "[a] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material fact and cannot rest on the allegations or denials in the pleadings or the conclusions or on legal opinions." Macera Brothers ofCranston. Inc. v. Gelfuso Lachut, Inc., 740 A.2d 1262, 1264 (R.I. 1999) (citing Manning Auto Parts. Inc. v. Souza, 591 A.2d 34, 35 (R.I. 1991)). If the opposing party cannot establish the existence of a genuine issue of material fact, summary judgment must be granted. Grande v.Almac's, Inc., 623 A.2d 971, 972 (R.I. 1993).
The Defendant Picerne argues that summary judgment should enter as to counterclaim I, declaring that the drop cables at issue are fixtures and therefore are owned by Picerne. In the alternative, Picerne seeks summary judgment on counterclaim II, declaring that the Plaintiff Cox has abandoned the cable home wiring segment of the drop cables pursuant to47 C.F.R. § 76.802(e). Additionally, Picerne seeks summary judgment on counterclaim III, declaring that the Plaintiff Cox has abandoned the home run wiring segment of the drop cables pursuant to47 C.F.R. § 76.804(b)(4).
The Plaintiff, on the other hand, argues that the Defendant's request for summary judgment should be denied as to counterclaim I because according to both the Agreements as well as relevant case law, the drop cable are not fixtures. Furthermore, the Plaintiff contends that the Defendant Picerne's request for summary judgment should be denied as to counterclaims II and III because the cable home wiring and the home run wiring have not been abandoned by operation of the cited federal regulations. In fact, the Plaintiff argues, the federal regulations do not apply to the instant matter, since the Agreements between the parties provide the Plaintiff with a legally enforceable right to remain on the property.
In light of this Court's holding that declaratory judgment should enter, finding that the drop cables have been abandoned pursuant to the federal Cable Inside Wire Rules and that Picerne now owns those abandoned drop cables, this Court further concludes that there exists no genuine issue of material fact in dispute as to Defendants' counterclaims II and III. Accordingly, summary judgment shall enter for the Defendant Picerne as to counterclaims II and III.
Consistent with this Court's finding that the record does not presently contain evidence sufficient for this Court to declare that the drop cables are fixtures, this Court further finds that a genuine issue of material dispute exists as to whether the drop cables are fixtures. Accordingly, summary judgment is denied for the Defendant Picerne as to counterclaim I.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, as well as a review of the other materials properly before this Court, this Court finds that the Cable Inside Wire Rules governing the disposition of the home run wiring segment and the cable home wiring segment of drop cables are applicable to the instant matter. This Court further finds that the Plaintiff has abandoned the home run wiring segment of the drop cables at the particular units at the Properties, at which residents/subscribers have actually terminated service with Cox. This holding is specifically conditioned upon Picerne filing with the Court evidence sufficient to prove that for each and every home run wire Picerne seeks to deem abandoned, that particular subscriber/resident has terminated services with Cox.* (See footnote #34).
This Court also finds that the cable home wiring at the Picerne Property dwellings at which former subscribers have terminated service with Cox has been abandoned by operation of 47 C.F.R. § 76.802(e). This holding is specifically conditioned upon Picerne filing with the Court evidence sufficient to prove that that for each and every cable home wire Picerne seeks to deem abandoned, that particular subscriber/resident has terminated services with Cox.* (See footnote #34).
This Court further finds that Cox failed to make any offer to sell the cable home wiring, nor did Cox ever seek to remove the cable home wiring. Accordingly, this Court holds that the cable home wiring at all of the Picerne Properties has been abandoned by operation of47 C.F.R. § 76.804(a)(4).
Accordingly, Plaintiffs request for declaratory and injunctive relief is denied. Furthermore, the Defendants' request for partial summary judgment as to counterclaim I is denied, and the Defendants' request for partial summary judgment as to counterclaims II and III is granted. Finally, declaratory judgment shall enter providing that the Defendant Picerne owns all of the cable home wiring segment of the drop cables located at the Properties. Declaratory judgment shall further enter providing that the Defendant Picerne owns the home run wiring segment of the drop cables located at the particular units referenced in the conditional holding of this Court.
Counsel shall submit an appropriate order for entry.
[1] Cox is a Delaware corporation, qualified to do business in the state of Rhode Island, with its principal place of business in Cranston, Rhode Island.
[2] In addition to cable services, Cox offers other broadband services including digital television, high speed internet services and telephony.
[3] The term "franchise" is defined in 47 U.S.C. § 522(9) as "an initial authorization, or renewal thereof. issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system."
[4] Section 3.1 states "All certificates granted in accordance with Title 39, Chapter 19 of the Rhode Island General Laws, as amended, shall be non-exclusive in nature and of an indefinite term."
[5] Picerne is a Rhode Island corporation.
[6] CoxCom alleges that Picerne owns or manages 34 properties. Picerne alleges that it owns or manages 36 properties. The discrepancy apparently arises from the fact that one of the properties, Simmonsville, is actually three separate and distinct legal entities covering three separate and distinct parts of the complex commonly known as Simmonsville. Those entities are referred to as Simmonsville I, Simmonsville LI, and Simmonsville III. Defs Mem. of Law at 2.
[7] The names and addresses of these properties are listed in "Schedule A" to a February 14, 2002 letter written by counsel for Picerne that is attached to Cox's verified complaint as Exhibit 1.
[8] The predecessors-in-interest of Cox that entered into contracts with the owners of various Picerne Properties are: Cable TV of East Providence; Cox Cable Cranston/Johnston, Inc.; Heritage Cablevision, Inc.; Rhode Island CATV Corp.; Times Mirror Cable Television of Rhode Island, Inc.; and Heritage Cablevision, Inc. d/b/a Rollins Cablevision.
[9] The record does not indicate when individual mergers or acquisitions took place between Cox and any of its predecessors-in-interests. The record is also silent as to when Cox acquired any of its Certificates. Both the Plaintiff and the Defendants agree that Cox currently has a franchise in effect in Rhode Island, and that Cox currently has operating Certificates in all 13 of the Service Areas in Rhode Island. Neither party, however, supplies the Court dates relevant to these documents or events.
[10] A "drop cable" is a single coaxial cable dedicated to provide service to only one dwelling unit The drop cable starts inside the dwelling unit at a wall plate and then runs through the ceilings and walls of the building to the point outside the building where it meets the trunk cable.
[11] A "trunk cable" carries the signals for multiple subscribers. Trunk cables are typically installed underground between buildings though there are a few areas where they are attached to buildings above ground. Trunk cables are also known as "feeder" cables because they "feed" the signal to the drop cable.
[12] A "tap" is the device that connects the drop cable to the trunk cable. Taps are also commonly referred to as "splitters" because they "split" the signal off of the trunk cable and put it on the drop cable.
[13] A "pedestal" is installed on the exterior of the building at ground level near the building. The pedestal is the enclosure where the drop cables meet the trunk cables and are connected by the taps.
[14] A "junction box" is installed on the exterior of the building above ground level. Like the pedestal, a junction box is the enclosure where the drop cables and trunk cables meet and are connected by the taps. The record also indicates that a property will have either pedestals or junction boxes, rarely both.
[15] The record does not indicate who installed the facilities or when they were installed. The Defendants specifically state that neither Picerne nor Starlight installed any of the facilities. Reference is made by both parties that they each assume the facilities were installed by the original signatories to the Agreements; that is, predecessors-in-interest to Cox.
[16] The Defendants allege that Starlight introduced its service in August of 2000, while the Plaintiff alleges that the Z"summer of 2000) was the operative time. The record does not indicate with any further specificity when these Starlight installations occurred.
[17] The Starlight Defendants are Rhode Island corporations that provide multichannel video programming.
[18] The record does not indicate at which Property the satellite television receiving facility was constructed.
[19] While the record indicates that the letter was dated July 27, 2000, it is not entirely clear that the letter preceded any Starlight installation or utilization of existing drop cables.
[20] "Cable home wiring" is defined in 47 C.F.R. § 76.5 as "[t]he internal wiring contained within the premises of a subscriber which begins at the demarcation point."
[21] A "multichannel video programming distributor" is defined in Section 602 (13) of the Communications Act, 47 U.S.C. § 522(13) as a "person such as, but not limited to, a cable operator, a multichannel multipoint distribution service, a direct broadcast satellite service, or a television receive-only satellite program distributor, who makes available for purchase, by subscribers or customers, multiple channels of video programming."
[22] Paragraphs (a) and (b) of 47 C.F.R. § 76.804 contain procedures for building by building disposition of home run wiring and for unit by unit disposition of home run wiring.
[23] The Properties were Bayside Apartments, Brookside Apartments, Cowesett Hill, Fairfax Village, Pilgrim Park, Quaker Towers, Shady Oaks, and Villa del Rio.
[24] "Cable home wiring" is defined in 47 C.F.R. § 76.5 as "[t]he internal wiring contained within the premises of a subscriber which begins at the demarcation point."
[25] Picerne's first counterclaim seeks a declaration that all of the cable television facilities installed at the Properties and used by the Plaintiff belong to Piceme because they are fixtures. At this stage in the proceeding, Picerne seeks partial summary judgment declaring that only the drop cables are fixtures. In the alternative, Picerne seeks summary judgment on the second counterclaim that the Plaintiff has abandoned the cable home run wiring segment of most of the drop cables pursuant to 47 C.F.R. § 76.802(e) and on the third counterclaim that the Plaintiff has abandoned the home run wiring segment of some of the drop cables pursuant to 47 C.F.R. § 76.804(b)(4). Piceme does not seek summary judgment on the fourth counterclaim at this time.
[26] In the Matter of Telecommunications Services Inside Wiring:Customer Premises Eguipment; In the Matter of Implementation of the CableTelevision Consumer Protection and Competition Act of 1992: Cable HomeWiring, Report and Order and Second Further Notice of Proposed Rulemaking, CS Docket No. 95-184, MM Docket No. 92-260, FCC No. 95-503, Released January 26, 1996 (the Cable Home Wiring Order).
[27] In the Matter of Telecommunications Services Inside Wiring:Customer Premises Eguipment; In the Matter of Implementation of the CableTelevision Consumer Protection and Competition Act of 1992: Cable HomeWiring, Report and Order and Second Further Notice of Proposed Rulemaking, CS Docket No. 95-184, MM Docket No. 92-260, FCC No. 97-376, Released October 17, 1997, 62 FR 61016, 1997 WL 704275 (F.R.) (the Home Run Wiring Order).
[28] Several months later, on November 1, 2002, during the pendency of this action, counsel for Piceme sent a notice to Cox. This time, the notice was for the purpose of invoking the procedures set forth in 47 C.F.R. § 804(a)(1) for the building by building disposition of home run wiring in the Properties. Piceme, by virtue of this notice, also sought to invoke the procedures set forth in 47 C.F.R. § 804 (a)(4), for election by Picerne as owner, to exercise the rights of individual subscribers pursuant to 47 C.F.R. § 802 (rules pertaining to cable home wiring). The record indicates that Cox did not respond with an election within 30 days (or any time thereafter).
[29] The Properties were Bayside Apartments, Brookside Apartments, Cowesett Hill, Fairfax Village, Pilgrim Park, Quaker Towers, Shady Oaks, and Villa del Rio.
[30] This Court notes that the specific legally enforceable right to which Cox lays claim is the right "to maintain any particular home run wire dedicated to a particular unit on the premises against the MDU owner's wishes." 47 C.F.R. § 76.804(b)(1).
[31] The Properties are Bayside Apartments, Brookside Apartments, Cowesett Hill, Fairfax Village, Pilgrim Park, Quaker Towers, Shady Oaks, and Villa del Rio.
[32] The Shady Oaks Agreement is the only Agreement that is between Cox and Piceme. All other Agreements were apparently executed between predecessors-in-interest to Cox and Picerne.
[33] The presumptive value of the right of access to a multifamily property to install cable television facilities is a nominal one dollar ($1.00). See RI. Gen. Laws § 39-19-10(6).
[34] The condition may be satisfied by defendant filing with the Court and with the plaintiff an affidavit setting forth this information and the information referenced by an * on pages 40, 43 and 44 hereof. Such affidavit shall be filing by September 11th. Plaintiff may file counter affidavits by September 25th. If no disputed facts exist by reason of any affidavits so filed, appropriate orders consistent with the findings hereof may enter upon notice from defendant's counsel to plaintiffs counsel. If there are factual disputes, the parties are directed to meet with the Court for the purpose of scheduling appropriate evidentary hearings.
[35] The record reflects that Cox has not made any offer to sell the cable home wiring to Piceme, whether within 30 days, or any time thereafter.